[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Johnson v. Abdullah*, Slip Opinion No. 2021-Ohio-3304.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-3304

JOHNSON ET AL., APPELLEES, *v*. ABDULLAH, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Johnson v. Abdullah*, Slip Opinion No. 2021-Ohio-3304.]**

*Evid.R. 601—Expert testimony in medical-malpractice case—A physician employed in an executive position who does not directly oversee physicians who treat patients does not satisfy the active-clinical-practice requirement of Evid.R. 601.*

(No. 2020-0303—Submitted March 30, 2021—Decided September 22, 2021.)

APPEAL from the Court of Appeals for Hamilton County, No. C-180309, 2019-Ohio-4861.

_____

**FISCHER, J.**

{¶ 1} In this case, we are asked to consider what constitutes "active clinical practice" as that term is used in Evid.R. 601(B)(5). In accordance with the plain language of that rule, we hold that a physician employed in an executive position

who does not directly oversee physicians who treat patients does not satisfy the active-clinical-practice requirement of Evid.R. 601.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{¶ 2} Appellees, Mark Johnson (acting both in his individual capacity and in his capacity as a guardian of his brother, David Johnson) and two of his siblings—Glenda Johnson and Gary Johnson—filed a medical-malpractice suit. (For ease of discussion, we will refer to appellees collectively as "Johnson.") The allegation in the complaint that is relevant to this decision is Johnson's allegation that appellant, Dr. Anthony Abdullah, was negligent in his treatment of David in 2011.

{¶ 3} During the trial, Abdullah called Dr. Ron Walls to testify as an expert regarding the standard of care. Johnson had sought to prevent Walls from testifying on the basis that Walls failed to satisfy the requirements of Evid.R. 601 because he was not involved in the active clinical practice of medicine. After counsel conducted voir dire of Walls, the trial court determined that he was competent to testify. The jury found that Abdullah had not been negligent in treating David.

{¶ 4} Johnson raised numerous assignments of error on appeal. In its decision reversing and remanding the case for a new trial, the First District Court of Appeals addressed only Johnson's assignment of error challenging the trial court's decision to admit the expert testimony of Walls. 2019-Ohio-4861, 136 N.E.3d 581, ¶ 33. In beginning its analysis, the court stated that Ohio courts have sometimes struggled to apply the active-clinical-practice requirement of Evid.R. 601. *Id.* at ¶ 1. The court noted that Walls was the chief operating officer ("COO") of a hospital system. *Id.* at ¶ 2. Although Walls had testified that everything he did in his role as COO had an effect on patient care, the First District concluded that Walls's job was "almost entirely administrative." *Id.* The court reasoned that if Walls's activities constituted the active clinical practice of medicine, then nonphysician COOs would also be engaged in the active clinical practice of

2

medicine. *Id.* Considering this conclusion antithetical to Evid.R. 601, the court rejected Abdullah's argument that Walls was engaged in the active clinical practice of medicine, despite Walls's being an accomplished doctor. *Id.* at ¶ 2-3. Concluding that the plain language of Evid.R. 601 should have prevented Walls from testifying and that the trial court's decision permitting Walls's testimony was not harmless error, the court reversed the trial court's judgment and remanded the case for a new trial. *Id.* at ¶ 3, 32.

{¶ 5} We accepted jurisdiction over Abdullah's appeal, in which he set forth a single proposition of law: "When reviewing a trial court's decision on a witness'[s] competence, an appellate court is not free to weigh in on the credibility of that witness and substitute its own judgment for that of the trial court." *See* 158 Ohio St.3d 1511, 2020-Ohio-2815, 144 N.E.3d 462.

## II. ANALYSIS

{¶ 6} In his proposition of law, and throughout much of his argument before this court, Abdullah asserts that the First District improperly reweighed Walls's credibility. He maintains that in reversing the trial court's judgment, the appellate court rejected the trial court's finding that Walls's testimony was credible and substituted its own determination that Walls was not telling the truth. It is well-settled that the responsibility of weighing the credibility of a witness rests with the fact-finder. *See, e.g.*, *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The First District did not violate this principle. It accepted Walls's descriptions of his professional duties, activities, and responsibilities. *E.g.*, 2019-Ohio-4861, 136 N.E.3d 581, at ¶ 21. In reversing the trial court's judgment, the First District did not find Walls's testimony to be untruthful; instead, the court concluded, based on Walls's testimony, that Abdullah had failed to establish that Walls devoted at least one-half of his professional time to the active clinical practice of medicine. *Id.* at ¶ 24.

**{¶ 7}** Although Walls testified that he did meet this standard, neither the First District nor this court is required to accept Walls's determination that his professional duties satisfied the definition of the legal term "active clinical practice." *See State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 25 (explaining that appellate courts apply the law to the facts of individual cases to make legal determinations and that just because "facts are involved in the analysis does not make the issue a question of fact deserving of deference to a trial court"). In such instances, the appellate court must independently determine, without deference to the trial court's conclusion, whether the facts satisfy the applicable legal standard. *Id.* at ¶ 26, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Indeed, no court should abdicate its duty to interpret the law to anyone, including an expert witness. Because this case turns on whether at least 50 percent of Walls's professional time was devoted to the active clinical practice of medicine as that term is used in Evid.R. 601, our analysis will focus on determining whether the activities that Walls spent the majority of his professional time engaged in qualify as the active clinical practice of medicine.

**{¶ 8}** Abdullah emphasizes that Walls is not a "hired gun" or "professional witness." In light of the fact that Walls's professional role changed in 2015, Abdullah asserts that pursuant to *Celmer v. Rodgers*, 114 Ohio St.3d 221, 2007-Ohio-3697, 871 N.E.2d 557 (plurality opinion), the trial court was permitted to look at Walls's activities at the time the alleged malpractice occurred to determine whether Walls was qualified to testify as an expert witness at trial. Abdullah asserts that based on the evidence in the record, 75 percent of Walls's professional time prior to 2015 was devoted to the active clinical practice of medicine or its instruction. Looking at the period after 2015 (the trial occurred in 2017), Abdullah asserts that Walls's testimony—particularly Walls's assertion that "[e]verything that happens related to patient care in [the] hospital is [his] direct responsibility"—establishes that Walls was engaged in the active clinical practice of medicine.

4

{¶ 9} Johnson responds that Walls was not competent to testify under Evid.R. 601, because the evidence in the record shows that prior to 2015, Walls devoted the majority of his professional time to administrative matters and medical-legal consulting work and that after 2015, Walls devoted 90 percent of his time to administrative and executive matters.

{¶ 10} The parties do not dispute the substance of Walls's testimony regarding the specific duties and responsibilities he had prior to and after 2015. Each accepts that testimony at face value, with the differences between the parties' positions essentially consisting of differing views on whether those duties and responsibilities may be characterized as the active clinical practice of medicine under Evid.R. 601.

{¶ 11} Evid.R. 601(B) provides in relevant part that a person is disqualified to testify as a witness when the court determines that the person is

> (5) * * * *giving expert testimony on the issue of liability in any medical claim*, as defined in R.C. 2305.113, asserted in any civil action against a physician, podiatrist, or hospital arising out of the diagnosis, care, or treatment of any person by a physician or podiatrist, *unless*:
>
> * * *
>
> (b) *The person devotes at least one-half of his or her professional time to the active clinical practice* in his or her field of licensure, *or to its instruction* in an accredited school.

(Emphasis added.) Evid.R. 601 was amended in 2020 and 2021 (while this case was pending), and the amendments caused this provision to be renumbered from Evid.R. 601(D) to Evid.R. 601(B)(5). The amendments did not substantively

change the relevant provision. For the purposes of this analysis, we will refer to the provision by its current section.

*A. An overview of our decisions addressing the active-clinical-practice requirement*

{¶ 12} Before addressing to what extent Walls was engaged in the active clinical practice of medicine under Evid.R. 601, we will briefly review our previous decisions addressing the active-clinical-practice requirement.

**1. *McCrory v. State***

{¶ 13} The seminal case in this area is *McCrory v. State*, 67 Ohio St.2d 99, 423 N.E.2d 156 (1981). In that case, we held that "active clinical practice" includes "work [that] is so related or adjunctive to patient care as to be necessarily included in that definition for the purpose of determining fault or liability in a medical claim." *Id*. at syllabus.

{¶ 14} In *McCrory*, in which we interpreted a statutory precursor to the current Evid.R. 601, we began our analysis by noting that the relevant statute (like the current rule) did not define the term "active clinical practice." *Id*. at 103. We explained that "the statute deals with the basic unfairness of permitting the pointing of accusatory fingers by those who do not take care of the sick toward those who do." *Id.* We added that

> the purpose of the statute is to preclude testimony by the physician who earns his living or spends much of his time testifying against his fellows as a professional witness, and to prevent those whose lack of experiential background in the very field they seek to judge, the clinical practitioner, makes the validity of their opinions suspect, from expressing those opinions for pay or otherwise.

*Id.* In analyzing the term "active clinical practice," we cautioned that "we must devise a definition of active clinical practice of medicine that is not so narrow as to include only the physician who is in direct contact with the patient at his bedside," because to do so "would exclude the large panoply of medical expertise of various physician-specialists who work daily in and for our hospitals often assisting, directing, or advising the attending physician in his care of the sick." *Id.* We explained that the definition of "active clinical practice" must include the work of doctors "directly involved in the care of the patient," because those doctors' "ministrations form inseparable parts of that patient's care" and their expertise is necessary to determine any fault or responsibility. *Id.* Thus, we concluded that "active clinical practice" necessarily includes the work typical of pathologists, radiologists, hematologists. *Id.* at 104.

### 2. *Celmer v. Rodgers*

**{¶ 15}** Approximately 25 years after *McCrory*, 67 Ohio St.2d 99, 423 N.E.2d 156, was decided, and after the active-clinical-practice requirement had been incorporated into Evid.R. 601, we revisited the issue of what satisfies the active-clinical-practice requirement. *Celmer*, 114 Ohio St.3d 221, 2007-Ohio-3697, 871 N.E.2d 557 (plurality opinion). In *Celmer*, a trial that was scheduled to start was continued at the request of the defense and was then stayed due to the insolvency of a defendant's insurance carrier. *Id.* at ¶ 2. As a result of the delays, the trial took place more than two years after the originally scheduled trial date, and at that time, the plaintiff's expert witness no longer devoted at least one-half of his professional time to the active clinical practice of medicine. *Id.* The specific issue before the court was whether under those circumstances a trial court may permit that witness to testify as an expert. *Id.*

**{¶ 16}** In *Celmer*, a plurality of the court emphasized that the *McCrory* court had rejected a narrow interpretation of the active-clinical-practice requirement and had explained that the purpose of the requirement is to preclude

testimony by a physician who spends much of his or her time testifying as a "professional witness" and to prevent expert testimony by physicians who lack an experiential background in the area at issue in a case. *Celmer* at ¶ 21, citing *McCrory* at 104. The plurality further explained that the preliminary questions concerning the qualification of a person to be a witness " 'shall be determined by the [trial] court.' " (Emphasis added in *Celmer* deleted.) *Celmer* at ¶ 24, quoting Evid.R. 104(A).

{¶ 17} Unlike *McCrory*, *Celmer* did not turn on whether the expert witness's professional activities constituted the active clinical practice of medicine. Instead, the key issue was whether a trial court has discretion to permit a party's medical expert to testify as an expert when the expert does not satisfy the requirements of Evid.R. 601 at the time the trial takes place but did satisfy the requirements at the time the trial was originally scheduled to start, the trial having been delayed at the request of the opposing party. *Celmer* at ¶ 2. The *Celmer* plurality noted that the active-clinical-practice requirement of Evid.R. 601 is written in the present tense. *Id.* at ¶ 25. Nevertheless, the plurality found it appropriate in that case to apply an exception to the rule's present-tense language: "[The present-tense language] * * * does not preclude a trial court from exercising discretion in an appropriate case to determine that a physician is competent to testify, as in this case, where the witness would have qualified as an expert but for defense continuances and a stay of proceedings resulting from the insolvency of a defendant's carrier." *Id.* The plurality emphasized that "[g]enerally, an expert witness in a medical malpractice action must meet the requirements of Evid.R. 601[(B)(5)(b)] at the time the testimony is offered at trial." *Id.* at ¶ 27. "But," it stated, "the facts here are an exception to that general rule." *Id.*

{¶ 18} In a dissent, Justice Robert Cupp emphasized that the active-clinical-practice requirement is written in the present tense. *Id.*, 114 Ohio St.3d 221, 2007-Ohio-3697, 871 N.E.2d 557, at ¶ 34 (Cupp, J., dissenting). He concluded that no

judicially created exception should override the plain language of the rule. *Id.* at ¶ 37 (Cupp, J., dissenting). Because the trial court's decision allowing the expert to testify was contrary to what Justice Cupp viewed to be the plain language of the rule, he concluded that the trial court's ruling constituted an abuse of its discretion. *Id.*

*B. We decline to expand the* Celmer *exception*

{¶ 19} The first question before us in analyzing the present case is which period of time to look at in determining whether Walls was engaged in the active clinical practice of medicine. Abdullah asks us to expand the *Celmer* exception to allow a court to consider the expert's job duties at the time of the alleged malpractice. If we do not expand the *Celmer* exception, we focus on the time of trial, i.e., the time when Walls testified.

{¶ 20} We decline to expand the *Celmer* exception. As the *Celmer* plurality explained, the general rule is that the witness must meet the active-clinical-practice requirement of Evid.R. 601 at the time the testimony is offered at trial. *Id.*, 114 Ohio St.3d 221, 2007-Ohio-3697, 871 N.E.2d 557, at ¶ 27 (plurality opinion). *Celmer* sets forth a limited exception to that rule, and the exception is clearly confined to the particular facts of that case.

{¶ 21} Abdullah relies on the timeline of this case in asserting that this court should look at Walls's pretrial activities in determining Walls's competency. According to Abdullah, Johnson filed the original complaint in 2012, Walls was first identified as an expert witness in 2013, and Johnson voluntarily dismissed the case in 2014. In January 2015, Walls took on the role of COO (the same role that he was in at the time of trial). Johnson refiled the case in April 2015, and the trial occurred in 2017.

{¶ 22} These facts are significantly different from the facts of *Celmer*. Again, in *Celmer*, the court created a limited exception to allow for consideration of the witness's activities at the time the trial was originally scheduled to begin.

Here, Abdullah asks us to extend that exception to consider a witness's activities not only before the original trial date, but before the case was even filed in its current incarnation.

{¶ 23} It is an unfortunate reality that medical-malpractice actions often proceed at a snail's pace. Abdullah has not demonstrated that Johnson acted with the intention of stalling until Walls was not competent to testify under the rule. Moreover, Abdullah had ample time after the complaint was refiled to find a witness who was qualified under the rule. If we were to extend the *Celmer* exception to permit the expert's testimony in this case, we would in effect be rewriting the plain language of Evid.R. 601, which states that the witness must presently be engaged in the active clinical practice of medicine.

{¶ 24} For these reasons, we limit *Celmer* to its facts, and we instead apply the general rule identified in that case: the witness must meet the active-clinical-practice requirement of Evid.R. 601 at the time the testimony is offered at trial. We accordingly decline to consider Walls's activities prior to 2015.

*C. Walls did not satisfy Evid.R. 601's active-clinical-practice*
*requirement at the time of trial*

{¶ 25} This brings us to the key issue in this case: Did Walls satisfy Evid.R. 601's active-clinical-practice requirement at the time of trial? Under *McCrory*, we should not read the requirement so narrowly that it precludes the testimony of a physician who does not directly treat patients but still acts in a role that is adjunctive to patient care. *Id.*, 67 Ohio St.2d at 103-104, 423 N.E.2d 156.

{¶ 26} The evidence in this case indicates that Walls did not act in a role adjunctive to patient care. Walls initially testified, "[P]robably 90 percent of my work would be characterized as purely executive or administrative." As part of this executive or administrative work, Walls testified, he is "responsible for all of the teaching and training programs in the hospital" and that he is responsible for "[a]ll of the quality and safety related to patient care" and "[a]ll of the clinical operations

related to patient care, including the operating rooms, all of the inpatient units, the emergency department, [and] post-operative recovery areas." He testified:

> I'm responsible for the introduction of new innovations and technology into the hospital, new programs and quality assessment, I mean safety and quality for the patients, and the teaching programs that train residents and students in medicine, and programs that train our future leaders in quality, safety, and how to provide excellent patient care.

{¶ 27} Regarding his professional time that is not executive or administrative related, Walls testified that he devotes one hour a week to making hospital rounds with the hospital's chief nurse, which consists of visiting with residents and nurses who deliver direct patient care. He also testified that he holds mentoring sessions with faculty "about their research and career development," but he noted that these mentoring sessions do not take up "a huge amount" of his time.

{¶ 28} In trying to establish that Walls served in a role that was adjunctive to patient care, Abdullah relies on Walls's testimony that "all [of his] administrative work, with a very tiny exception, is directly related to patient care." But in following up that statement, in response to the question whether his role was "so adjunctive to patient care as to practically constitute clinical practice in and of itself," Walls said, "I would say it directly influences our organization." Walls disagreed with the attorney's assertion that what Walls does "really doesn't constitute clinical practice" and said: "Virtually everything I do in my day, in my week, in my month, how I plan, has a direct influence on patient care," and "I'm influencing the care every single day of thousands of * * * people." As examples, he stated that he is responsible for making sure that the hospital is adequately staffed and that hospital staff has the proper technology to treat patients. He

summed up his voir dire testimony by stating, "I have * * * a direct role every day in mentoring and guiding our department chairs, our clinical nurse leaders. I run the entire quality and safety programs, the education programs. Everything that happens related to patient care in our hospital is my direct responsibility."

{¶ 29} The proponent of expert testimony bears the burden of showing that the expert is qualified to testify competently regarding the issue at hand. *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.2004). In this case, Abdullah failed to show that Walls was engaged in the active clinical practice of medicine at the time of trial. Walls was a true executive. Notably, Walls did not testify that he directly supervised any of the physicians at the hospital who treated patients. Instead, he ensured that the hospital was running properly. At best, Walls indirectly supervised doctors, as he emphasized that he mentored and guided the hospital's department chairs and clinical-nurse leaders. His testimony indicates that he was not involved in supervising doctors who were treating patients but that his day-to-day contact was primarily with the hospital's management personnel.

{¶ 30} While it may be true that everything that Walls did had an impact on the hospital's overriding mission of treating patients, Walls did not interact with the physicians who were treating patients. While Walls's role was vital and essential to the hospital, he was not engaged in the active practice of medicine or in a role adjunctive to patient care.

{¶ 31} We further note that time spent teaching may be used to qualify under Evid.R. 601. Evid.R. 601 provides that in order to qualify as a witness, a person must devote "at least one-half of his or her professional time to the active clinical practice in his or her field of licensure, *or to its instruction in an accredited school*." (Emphasis added.) Walls testified that he teaches an hour-long classroom session once every three or four months. Given the limited amount of time that Walls devoted to the instruction of medicine, we conclude that even when Walls's

teaching responsibilities are taken into account, he was not qualified to testify under Evid.R. 601.

{¶ 32} Just as we decline to extend the *Celmer* exception, we decline to extend *McCrory* to hold that "active clinical practice" of medicine as that term is used in Evid.R. 601(B)(5)(b) includes the primarily executive work of a doctor in an administrative role. We accordingly hold that a physician employed in an executive position who does not directly oversee physicians engaged in treating patients does not satisfy the active-clinical-practice requirement of Evid.R. 601.

{¶ 33} Applying that holding to this case, we conclude that the trial court committed reversible error in permitting Walls to testify as an expert. Abdullah asks us to apply the traditional abuse-of-discretion standard in reviewing this case and to determine whether the trial court's decision was arbitrary, unreasonable, or unconscionable. The abuse-of-discretion standard, however, does not neatly apply to a case like this—i.e., a case in which the trial court relied on an erroneous conception of the active-clinical-practice requirement of Evid.R. 601.

{¶ 34} We have stated that "[a]n abuse of discretion is more than an error of law or judgment; it implies that the trial court's attitude, in reaching its decision, was arbitrary, unreasonable, or unconscionable." *See, e.g.*, *Celmer*, 114 Ohio St.3d 221, 2007-Ohio-3697, 871 N.E.2d 557, at ¶ 19 (plurality opinion), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). However, it has been noted by at least one Ohio appellate court that this is an "offensive formulation." *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, 932 N.E.2d 345, ¶ 17 (2d Dist.). As the Second District detailed in *Boles*, the notion that an abuse of discretion is more than an error of law can be traced back to a 1940 decision of this court, *Steiner v. Custer*, 137 Ohio St. 448, 31 N.E.2d 855 (1940). *Boles* at ¶ 17. In *Steiner*, the court relied upon the second edition of *Black's Law Dictionary* as support for its statement that "[t]he meaning of the term 'abuse of discretion' in relation to [the granting of a motion for a new trial] connotes

something more than an error of law or judgment." *Steiner* at 451. The *Steiner* court, however, did not quote the *Black's Law Dictionary* definition in its decision. It did, however, quote a Massachusetts Supreme Court decision in stating that "[s]uch term has been defined as 'a view or action "that no conscientious judge, acting intelligently, could honestly have taken." ' " *Steiner*, quoting *Long v. George*, 296 Mass. 574, 579, 7 N.E.2d 149 (1937), quoting *Davis v. Boston Elevated Ry. Co.*, 235 Mass. 482, 502, 126 N.E. 841 (1920).

{¶ 35} In fact, the second edition of *Black's Law Dictionary*, which the court relied upon in *Steiner*, does not support the court's statement that an abuse of discretion connotes something more than an error of law:

> This term, commonly employed to justify an interference by a higher court with *the exercise of discretionary power* by a lower court, implies *not merely error of judgment*, but perversity of will, passion, prejudice, partiality, or moral delinquency. *The exercise of an honest judgment*, however erroneous it may appear to be, *is not an abuse of discretion*.

(Emphasis added.) *Black's Law Dictionary* 11 (2d Ed.1910). Clearly absent from this definition is any indication that the abuse-of-discretion standard applies when a court is making a determination of law. Indeed, this definition squares with the common understanding of what constitutes an abuse of discretion: a court exercising its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority.

{¶ 36} It bears noting that the holding of *Steiner* focused on a specific application of the term "abuse of discretion": "The meaning of the term 'abuse of discretion' in relation to the granting of a motion for a new trial connotes more than an error of law or of judgment; it implies an unreasonable, arbitrary or

14

unconscionable attitude on the part of the court." *Steiner* at paragraph two of the syllabus. That conclusion was grounded in the context of a motion for a new trial, with the court stating that "the granting or refusing of a motion for a new trial rests largely in the sound discretion of the trial court." *Id.* at 451. Thus, *Steiner* should not be read as applying to questions that are not within "the sound discretion" of a trial court.

{¶ 37} This court made that point clear in *Rohde v. Farmer*, 23 Ohio St.2d 82, 262 N.E.2d 685 (1970). In that decision, the court explained, "The concept of 'abuse of discretion' as the basis for determining 'error' of the trial court connotes the right to exercise a sound discretion. Conversely, where a specific action, ruling or order of the court is required as a matter of law, involving no discretion, the test of 'abuse of discretion' should have no application." *Id.* at 89. The *Rohde* court accordingly held that "[w]here a new trial is granted by a trial court, for reasons which involve no exercise of discretion but only a decision on a question of law, the order granting a new trial may be reversed upon the basis of a showing that the decision was erroneous as a matter of law." *Id.* at paragraph two of the syllabus.

{¶ 38} As the Second District stated in *Boles*, "No court—not a trial court, not an appellate court, nor even a supreme court—has the authority, within its discretion, to commit an error of law." *Boles* at ¶ 26. This should be axiomatic: a court does not have discretion to misapply the law. A court has discretion to settle factual disputes or to manage its docket, for example, but it does not have discretion to apply the law incorrectly. That is why courts apply a de novo standard when reviewing issues of law. *See, e.g.*, *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, 936 N.E.2d 481, ¶ 30.

{¶ 39} We take this opportunity to make it clear that courts lack the discretion to make errors of law, particularly when the trial court's decision goes against the plain language of a statute or rule. In this case, the First District correctly determined that a physician employed in an executive position who does

not directly oversee physicians engaged in treating patients does not satisfy the plain language of the active-clinical-practice requirement of Evid.R. 601. Because the trial court committed an error of law in determining otherwise, and because the error was not harmless, *see* 2019-Ohio-4861, 136 N.E.3d 581, at ¶ 30-32, we affirm the First District's judgment.

{¶ 40} As the First District noted in its decision, this result may not be ideal, given that Walls's credentials would seem to make him well suited to testify in this case. 2019-Ohio-4861, 136 N.E.3d 581, at ¶ 24. Nevertheless, to hold otherwise would be contrary to Evid.R. 601 and would elevate its perceived purpose above its actual text. Being an executive far removed from treating patients does not qualify as engaging in the active clinical practice of medicine. If Ohio's Rules of Evidence should allow doctors who work in positions such as Walls's to testify as experts in cases like this, then the rule must be amended through the proper rule-amendment process. We should not amend the rule by misinterpreting its plain language.

{¶ 41} As a final note, we acknowledge that a large portion of Johnson's merit brief is dedicated to issues that are unrelated to the proposition of law accepted for review by this court and are not properly before this court in this appeal. Because the additional issues raised by Johnson were not addressed by the First District below and are beyond the scope of the proposition of law accepted for review in this appeal, we decline to address them.

### III. CONCLUSION

{¶ 42} We hold that a physician employed in an executive position who does not directly oversee physicians who treat patients does not satisfy the active-clinical-practice requirement of Evid.R. 601. Because Walls did not satisfy the active-clinical-practice requirement of the rule, we affirm the decision of the First District.

Judgment affirmed.

O'CONNOR, C.J., and KENNEDY, DEWINE, DONNELLY, and BRUNNER, JJ., concur.

STEWART, J., concurs in judgment only.

_____

Brannon & Associates, Dwight D. Brannon, and Kevin A. Bowman, for appellees.

Arnold Todaro Welch & Foliano Co., L.P.A., John B. Welch, and Gregory B. Foliano, for appellant.

_____