[Cite as *Lakewood v. Tittl*, 2026-Ohio-2413.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

|  |  |  |
|---|---|---|
| CITY OF LAKEWOOD, | : | |
| Plaintiff-Appellee, | : | No. 115701 |
| v. | : | |
| JULIE TITTL, | : | |
| Defendant-Appellant. | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 25, 2026

---

Criminal Appeal from the Lakewood Municipal Court
Case No. TRC 2501218

---

### *Appearances:*

Myriam A. Miranda, Lakewood Prosecuting Attorney, and Andrew N. Fleck, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Erika B. Cunliffe, Assistant Public Defender, *for appellant.*

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant Julie Tittl appeals her conviction for one count of operating a vehicle while under the influence of alcohol or drugs ("OVI"). She claims the following errors:

1. The trial court erred in denying Julie Tittl's motion to suppress the results of the field[-]sobriety tests.

2. The trial court erred in excluding the notarized letter from Julie Tittl's physical therapist from the evidence considered at the suppression hearing.

3. Julie Tittl's OVI conviction is against the manifest weight of the evidence.

{¶ 2} We find that the motion to suppress was properly denied, that the notarized letter from Tittl's physical therapist was properly excluded, and that Tittl's OVI conviction is not against the manifest weight of the evidence. Accordingly, we affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} On March 17, 2025, Tittl was arrested and charged with OVI and failure to control her vehicle. Prior to trial, the city prosecutor placed a plea offer on the record. Because Tittl was a first-time offender and there was no accident, plaintiff-appellee City of Lakewood ("Lakewood" or "City") offered to resolve the entire case in exchange for a guilty or no-contest plea to either physical control, a first-degree misdemeanor that carries no points on a driver's license, or reckless operation, a second-degree misdemeanor with no mandatory suspensions but carries a four-point violation. Tittl rejected the plea offer.

{¶ 4} Tittl later filed a motion to suppress evidence of the field-sobriety tests administered to her at the time of her arrest on grounds that the officer who conducted the tests failed to comply with the standards outlined in the National Highway Traffic Safety Administration ("NHTSA") manual. By agreement of the

parties, the court held a hearing on the motion to suppress simultaneously with a bench trial on the charges.

{¶ 5} Stacy Hubert-Bash ("Hubert-Bash") testified that on the evening of March 17, 2025, she observed an SUV "swerving across the line . . . back and forth." (Tr. 43.)[1]  She was "terrified" that the driver, later identified as Tittl, would hurt herself or others, and she called 911. (Tr. 43-44.)  She explained:

> I honestly was terrified for them.  If you were to listen to the 911 call, you would hear me . . . .  I was just like, "Oh, my gosh.  Oh, my gosh. Please, you guys have got to get here because I don't know if something is wrong with the driver."
>
> So I was terrified.

(Tr. 45.)   Hubert-Bash followed Tittl's vehicle while she was talking to the 911 dispatcher, and she observed Tittl's SUV stop suddenly. (Tr. 44.)  By then, the police had arrived on the scene, and Hubert-Bash went home.

{¶ 6} Officer Raymond Halas ("Halas") testified that he responded to a complaint of a possibly intoxicated driver on the evening of March 17, 2025.  When he arrived on the scene, he observed Tittl's SUV "swerving all over its lane going eastbound." (Tr. 59.)  He explained:

> As I was getting close to that vehicle . . . the vehicle . . . swerved right out of its lane of travel, through a bunch of salt debris and everything on the road in a lane that was not for vehicular travel, struck the curb, and came to an abrupt stop with both passengers' tires up on top of the curb near the sidewalk.

(Tr. 60.)

---

[1] All the citations to the transcript refer to the transcript of the trial held on September 24, 2025.

{¶ 7} Halas testified that he could smell alcohol emanating from Tittl's car and that the odor became stronger when she began talking. (Tr. 62.) Halas was wearing a body camera that recorded his interactions with Tittl, and the body-camera video was entered into evidence as the City's exhibit No. 3. Halas asked Tittl why she left her lane of travel, and she replied that she was waiting for someone to give her instructions from the Gold Coast, an area on Lake Avenue. (Tr. 62; City exhibit No. 3.) They were stopped on Detroit Avenue in Lakewood, and Tittl repeatedly pointed to Lakewood City Hall when she was referring to the Gold Coast, but the Gold Coast bears no resemblance to City Hall. (Tr. 63; City exhibit No. 3.) Officer Halas asked Tittl what street they were on, and she told him they were on Clifton Boulevard when they were actually on Detroit Avenue. (Tr. 63; City exhibit No. 3.) Tittl has lived in Lakewood for 20 years and would likely have been familiar with the city's main streets. (Tr. 112.)

{¶ 8} Tittl told Halas that she was coming from the gym, which she identified as Planet Fitness in Lakewood, but Planet Fitness did not exist in Lakewood at that time. (Tr. 75.) Halas testified that Tittl was not dressed in "gym-style attire" and that she was wearing jeans, a sweatshirt, and a beaded shamrock necklace. (Tr. 75.)

{¶ 9} Following their brief conversation, Officer Halas asked Tittl to perform three field-sobriety tests. Before administering the tests, Halas asked Tittl if she had medical conditions that would limit her ability to perform the tests properly. (Tr. 65-66.) Tittl reported that she had Graves' disease, POTS, and long Covid. (Tr. 65.)

{¶ 10} According to Halas, Tittl was uncooperative and was unable to follow his instructions. He repeated the instructions for the horizontal gaze nystagmus ("HGN") test multiple times, and she eventually completed it. In doing so, Halas observed a "lack of smooth pursuit in both eyes," "nystagmus prior to 45 degrees in both eyes," and "sustained nystagmus at maximum deviation," which indicated six clues of impairment. (Tr. 66-71.)

{¶ 11} Halas next administered the walk and turn ("WAT") test. As with the HGN test, Halas had to explain the instructions several times before Tittl could complete the test. While Tittl performed the test, Halas observed "seven" of "eight" possible clues of impairment. (Tr. 71.) He explained that Tittl (1) was unable to stand in a starting position, (2) stepped off the line, (3) did not touch heel to toe, (4) took the incorrect number of steps despite repeated instructions, and (5) turned incorrectly before stopping completely. (Tr. 70-71.)

{¶ 12} Finally, Halas administered the one-leg stand ("OLS") test. During Tittl's performance of the OLS test, Halas observed three of four possible clues of impairment. (Tr. 72.) She swayed during the test, used her arms for balance, and put her foot down before the end of the 30-second time requirement. (Tr. 72; City exhibit No. 3.) Based on "the totality of the circumstances," including Tittl's driving behavior, the odor of alcohol, her inability to follow instructions, and her performance on the field-sobriety tests, Halas arrested her for OVI. (Tr. 72-73.)

{¶ 13} Upon reaching the Lakewood police station, Halas offered Tittl the opportunity to take a breath test. (Tr. 73.) Tittl attempted to call her attorney, but

she reached only his voicemail. Halas again offered the breath test, and Tittl again refused. (Tr. 74.) This process repeated itself "a couple of times" before Halas recorded the refusal to take the breath test. (Tr. 74.)

{¶ 14} Tittl testified in her own defense and presented the testimony of her endocrinologist, Dr. Robert Zimmerman ("Dr. Zimmerman"). Tittl testified that she has several debilitating health conditions, including "[l]ong COVID syndrome, Graves' disease, thyroid eye disease, comprehensive chronic pain, and . . . other conditions." (Tr. 113.) When asked to describe the symptoms of long Covid, she replied that she suffers from "[d]izziness, confusion, lightheadedness," which she explained "is attributed to the POTS." (Tr. 113.) She further stated that the symptoms of long Covid "very much . . . mimic that of one who has been drinking." (Tr. 113.) She stated that the symptoms of POTS affect her stability and ability to ambulate and that she has chronic pain. She explained:

> I have osteoarthritis. I see a rheumatologist. I have cortisone and steroid injections into my neck, my shoulder blades, my back, my hips, and my knees. It's so severe it's been ongoing. As you can see through my medical records, it's been going on for quite some time. I probably spend a good 20 to 30 hours per week with doctors' appointments, physical therapy, and such.

(Tr. 118.)

{¶ 15} Tittl further testified that she suffers from hypoglycemia, but she did not know prior to March 17, 2025, that she had hypoglycemia. (Tr. 146 and 130-131.) Dr. Zimmerman described the symptoms of hypoglycemia, stating that "with mild hypoglycemia, an individual can develop nervousness, sweats, and a rapid

heartbeat." (Tr. 22.) When the blood sugar goes lower, an individual can develop confusion, combativeness, and may even pass out. (Tr. 22.) Dr. Zimmerman admitted on cross-examination that he had no idea whether Tittl was hypoglycemic on or before March 17, 2025. (Tr. 35.) He also admitted that Tittl's symptoms of hypoglycemia were self-reported on a form that Tittl requested after she was arrested for OVI. (Tr. 36-37.)

{¶ 16} Nicholas Boatman ("Boatman"), a firefighter-paramedic with Lakewood Fire Department, was called to the jail on the night of March 17, 2025, to perform a blood-sugar test at Tittl's request. (Tr. 51 and 54.) He assessed Tittl before administering the test and explained at trial:

> Things such as sweaty, pale, cool, clammy skin, those are indicative of somebody who may have low blood sugar. Altered levels of consciousness, dizziness, I did not encounter any of those things and nor were any of those complaints voiced to us during this encounter.

(Tr. 54.) When Boatman tested Tittl's blood sugar, "it came back in at 97," which is within the normal range. (Tr. 54.) Hypoglycemia, i.e., low blood sugar, would produce a result of 70 or lower. (Tr. 22 and 54.)

{¶ 17} Based on the evidence presented, the court denied the motion to suppress evidence of the field-sobriety tests. The court also found Tittl guilty of one count of OVI and dismissed the failure-to-control charge. The court sentenced Tittl to a suspended 180-day jail term with three days of jail-time credit to complete a driver-intervention program. The court also imposed a six-month term of

community-control sanctions, a 12-month driver's license suspension, and a fine of $1,075 with $350 suspended. Tittl now appeals the trial court's judgment.

## II. Law and Analysis

## A. Motion to Suppress

{¶ 18} In the first assignment of error, Tittl argues the trial court erred in denying her motion to suppress the results of the field-sobriety tests. She contends the court erroneously found that the field-sobriety tests were administered in substantial compliance with the NHTSA manual.

### 1. Standard of Review

{¶ 19} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. Regarding factual determinations, "[a]n appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *State v. Hawkins*, 2019-Ohio-4210, ¶ 16, citing *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982). However, as an appellate court, we decide the legal questions "independently, without deference to the trial court's decision." *Id.*, citing *Burnside* at ¶ 8.

### 2. Substantial Compliance

{¶ 20} "[T]he state is not required to demonstrate strict compliance with testing standards in order for the results of the field sobriety tests to be admissible." *Cleveland v. Dargo*, 2018-Ohio-4430, ¶ 24 (8th Dist.). The City need only demonstrate that the officer substantially complied with NHTSA standards. *Id.*,

citing *Parma Hts. v. Dedejczyk*, 2012-Ohio-3458, ¶ 42 (8th Dist.), citing R.C. 4511.19(D)(4)(b).

{¶ 21} R.C. 4511.19(D)(4)(b)(i) provides that an officer may testify concerning the results of a field-sobriety test

> if it is shown by clear and convincing evidence that the officer administered the test in substantial compliance with the testing standards for any reliable, credible, and generally accepted field sobriety tests that were in effect at the time the tests were administered, including, but not limited to, any testing standards then in effect that were set by the national highway traffic safety administration[.]

{¶ 22} In other words, the results of field-sobriety tests "are not admissible at trial unless the state shows by clear and convincing evidence that the officer administered the test in substantial compliance with NHTSA guidelines." *State v. Codeluppi*, 2014-Ohio-1574, ¶ 11, citing R.C. 4511.19(D)(4)(b).

{¶ 23} "'The state may demonstrate what the NHTSA standards are through competent testimony and/or by introducing the applicable portions of the NHTSA manual.'" *Dargo*, 2018-Ohio-4430, at ¶ 24, quoting *Dedejczyk*, 2012-Ohio-3458, at ¶ 42.

{¶ 24} Substantial compliance is not defined in R.C. 4511.19(D)(4)(b). Therefore, trial courts have discretion "'to determine the substantiality of the compliance.'" *Cleveland v. Hyppolite*, 2016-Ohio-7399, ¶ 48 (8th Dist.), quoting *State v. Perry*, 2004-Ohio-7332, ¶ 45 (M.C.). "Because the statute does not define substantial compliance, this court makes a determination of whether the facts satisfy

the standard on a case-by-case basis." *Id.*, citing *Brookpark v. Key*, 2008-Ohio-1811, ¶ 52 (8th Dist.).

**a. HGN Test**

{¶ 25} Halas testified that he was trained to administer field-sobriety tests in 2008 and that he has had "in the neighborhood of 300 OVI encounters." (Tr. 62 and 66.) He also testified that he was familiar with the most recent NHTSA manual and the tests included with it and that he administered the tests in accordance with the NHTSA manual guidelines. (Tr. 66-73.)

{¶ 26} Tittl argues that Halas's administration of the HGN test was not in substantial compliance with the NHTSA guidelines because he skipped the equal tracking step, he conducted the smooth pursuit check too quickly, and he failed to conduct two full passes of each eye holding the stimulus for four seconds at maximum deviation.

{¶ 27} The NHTSA Refresher Participant Manual, revised in February 2023, provides the guidelines for conducting the HGN test.[2] It requires that the officer "be alert" for any medical conditions that could affect the tests, check the subject's pupil size and resting nystagmus, and check for equal tracking and smooth pursuit of the stimulus. NHTSA Participant Manual p. 13-17 and 32. With respect to equal tracking and smooth pursuit, the manual states:

> Step 3: Position the Stimulus. Position the stimulus approximately 12 - 15 inches (30 - 38 cm) in front of subject's nose and slightly above eye

---

[2] All references to the NHTSA manual refer to the NHTSA Participant Manual revised in February 2023.

level to commence the test. Resting Nystagmus may be observed at this time. Officers should note whether the subject displays Resting Nystagmus.

Step 5: Equal Tracking. Check for Equal Tracking. Move the stimulus from center to far right, to far left, and back to center. The speed of the stimulus should be approximately the same speed used as checking for the Lack of Smooth Pursuit. This check may be done more than once.

**There should be a clear, distinguishable break between the check for Equal Tracking and Lack of Smooth Pursuit.**

. . .

Step 6: Lack of Smooth Pursuit. Check the left eye for lack of the "Smooth Pursuit" clue. If the eye is observed to jerk while moving, that is one clue. Check the right eye for lack of the "Smooth Pursuit" clue and compare. Check each eye at least twice.

(Emphasis in original.) NHTSA Participant Manual p. 13-17 and 32. Regarding smooth pursuit, the manual further provides that "sustained nystagmus is evident when the eye is held at maximum deviation for a minimum of four seconds and continues to jerk toward the side." NHTSA Participant Manual p. 14.

{¶ 28} Before administering the test, Halas asked Tittl if she had any head injuries or other medical conditions that would affect her ability to perform the field-sobriety tests. (City exhibit No. 3.) He also asked Tittl if she needs glasses. After initially replying "yes" to needing glasses, Tittl changed her response and told Halas that she has had Lasik surgery and does not require corrective lenses. She also told Halas that she has had eye surgeries because of her thyroid condition and that she has POTS, which she described as a "debilitating disease from Covid-9 [sic]." (City exhibit No. 3.)

{¶ 29} Halas testified that when he began the HGN test, he first looked for Tittl's pupil size and for "equal tracking." (Tr. 66.) Halas used a pen as a stimulus and instructed Tittl to follow the tip of his pen with her eyes and without moving her head. (City exhibit No. 3.) From the video, it appears that he held the pen approximately 12-15 inches from Tittl's face and slightly above her eye level. She moved her head the first few times, and Halas had to start the test over.

{¶ 30} Halas eventually made two passes from the extreme right side of Tittl's field of vision to her extreme left side to assess equal tracking. He then held the pen at the extreme right and left positions for four seconds on each side to assess smooth pursuit. (City exhibit No. 3.) Although Halas did not stop for an extended break between each side while assessing equal tracking, he slowed the movement of the pen in the middle of the two sides during that test. He also held the pen in the middle for a break between the passes held for four seconds at maximum deviation. He was, therefore, able to assess equal tracking and a lack of smooth pursuit even if he did not strictly comply with the requirements.

{¶ 31} Tittl asserts that Halas only conducted one full pass per eye with a four-second hold, instead of the two holds required by the NHTSA manual. However, the body-camera video shows that Halas actually completed two full passes held for four seconds on each side in addition to a couple of additional attempts that failed because Tittl moved her head. (City exhibit No. 3.)

{¶ 32} Halas asked the necessary questions prior to performing the HGN test, and he completed every step of the test required by the NHTSA guidelines.

Although he failed to pause or break during the equal-tracking test, he substantially complied with the guidelines for administering the HGN test.

### b. WAT Test

{¶ 33} To properly administer the WAT test, the police officer must instruct the subject to take nine heel-to-toe steps in a straight line, turn on that line, and repeat another nine heel-to-toe steps in the opposition direction. NHTSA Refresher Participant Manual p. 32. Tittl argues that Halas should not have administered the WAT after she informed him of her health problems or that he should have at least inquired further about her health conditions before proceeding with the test. The NHTSA Manual acknowledges that certain subjects may have difficulty performing the WAT because of age or other health problems. However, the manual does not specify which health conditions warrant abstention from the test. The manual simply states that "[o]fficers should consider all factors when conducting [standard field-sobriety tests]." NHTSA Refresher Participant Manual p. 31.

{¶ 34} Halas inquired about, and made note of, all of the medical conditions Tittl reported to him. Although Tittl reported that she had POTS, she did not object to the WAT and, viewing the body-camera video, it appears that nothing prevented her from completing the test. Furthermore, the test was administered in a flat parking lot where Tittl was able to walk on a yellow stripe of a parking lot, notably making the test easier than walking on an imaginary line. Therefore, Halas substantially complied with the NHTSA guidelines when he administered the WAT in this case.

### c. OLS Test

{¶ 35} Tittl argues the court should have suppressed the administration of the OLS test because Halas failed to consider her medical conditions before administering the test and because he failed to properly instruct Tittl on how to perform the test.

{¶ 36} Tittl relies on *Middleburg Hts. v. Gettings*, 2023-Ohio-3536 (8th Dist.), in support of her argument that her medical conditions disqualified the OLS test. In that case, we held that the officer who administered the field-sobriety tests failed to substantially comply with the NHTSA manual guidelines because the officer failed to consider the subject's knee problems when he administered the WAT and OLS tests. *Id.* at ¶ 23. The defendant in *Gettings* told the police officer that he had a torn meniscus, and he walked with a limp. *Id.* at ¶ 19. The instant case is distinguishable from *Gettings* because a torn meniscus and a limp are obvious conditions that affect one's ability to perform the test. Tittl did not present with any obvious disability nor did she proclaim that any of her conditions would impair her ability to perform the tests. When Halas asked if she would be willing to perform the field-sobriety tests, she replied: "I would be happy to do so." (City exhibit No. 3.) Halas complied with the NHTSA manual by inquiring about Tittl's health conditions, but Tittl did not present with anything that would prevent the test.

{¶ 37} Tittl nevertheless argues the OLS test should have been suppressed because Halas failed to properly instruct her on how to perform the test. The NHTSA manual requires the officer to instruct the subject to hold one leg off the

ground for 30 seconds. Although the manual requires the officer to measure 30 seconds, it does not require the officer to count the seconds aloud.

{¶ 38} Halas told Tittl to hold the required position "until I tell you to stop." (City exhibit No. 3.) After Halas had twice repeated these instructions, Tittl asked, "When should I stop?" and Halas repeated for the third time, "when I tell you." (City exhibit No. 3.) Thereafter, Tittl performed the test. After holding her leg for 20 seconds, Tittl put her foot down and again asked Halas when she should stop. She failed to hold her leg for 30 seconds despite having been told three times to hold the position until Halas told her stop.

{¶ 39} Halas provided sufficient instructions for all the tests, and Tittl failed to follow them. Therefore, the first assignment of error is overruled.

### B. Notarized Letter

{¶ 40} In the second assignment of error, Tittl argues the trial court erred in excluding from evidence a notarized letter from her physical therapist offered for purposes of the suppression hearing. She contends the trial court erroneously excluded it as hearsay and that, even if it were hearsay, it should not have been excluded because the Ohio Rules of Evidence do not apply to suppression hearings.

{¶ 41} We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Schleich v. Penn Cent. Corp.*, 2024-Ohio-5005 ¶ 9 (8th Dist.). We, therefore, will not disturb a trial court's evidentiary ruling absent an abuse of discretion. *In re A.M.*, 2022-Ohio-612, ¶ 22 (8th Dist.).

{¶ 42} An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. However, "a trial 'court does not have discretion to misapply the law.'" *Morgan v. Greater Cleveland Regional Transit Auth.*, 2025-Ohio-1655, ¶ 64 (8th Dist.), quoting *Johnson* at ¶ 38. "Thus, an abuse of discretion also occurs when a court '"applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact."'" *Id.*, quoting *Thomas v. Cleveland*, 2008-Ohio-1720, ¶ 15 (8th Dist.), quoting *Berger v. Mayfield*, 265 F.3d 399 (6th Cir. 2001).

{¶ 43} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted in the statement." The notarized letter was an out-of-court statement by an out-of-court witness, not subject to cross-examination, that was offered to prove the truth of the matters asserted therein. The notarized letter was hearsay and, under Evid.R. 802, hearsay is inadmissible unless the out-of-court statement falls within a recognized exception to the hearsay rule. Tittl has not argued that any exception to the hearsay rule applies.

{¶ 44} Tittl nevertheless argues the court should not have excluded the letter because the rules of evidence do not apply to suppression hearings. Although the rules of evidence are not enforced in suppression hearings, the court still has discretion to exclude evidence. *State v. Bishop*, 2004-Ohio-6221, ¶ 18-19 (2d Dist.).

{¶ 45} In offering the notarized letter, defense counsel advised the court that the letter "deals with a follow-up regarding some of the testimony that my client is about to give and some of the testimony that my client has already given." (Tr. 19.) Counsel did not provide any other argument in favor of admitting it into evidence, and the court likely found that the letter was duplicative of Tittl's testimony. The court also heard extensive testimony from Tittl's endocrinologist regarding her medical conditions. Therefore, it was reasonable for the court to conclude that the notarized letter was not necessary to Tittl's defense, and we find no abuse of discretion in the trial court's decision to exclude it.

{¶ 46} The second assignment of error is overruled.

### C. Manifest Weight of the Evidence

{¶ 47} In the third assignment of error, Tittl argues the trial court erred in finding her guilty of OVI because her conviction is against the manifest weight of the evidence.

{¶ 48} When reviewing a manifest-weight challenge, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 2022-Ohio-1397, ¶ 54 (8th Dist.), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs

heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Martin* at 175.

{¶ 49} Hubert-Bash witnessed Tittl "swerving across the line . . . back and forth." (Tr. 43.) She testified that she was "terrified" by Tittl's driving and that she called 911. (Tr. 43-45.) Halas also testified that he observed Tittl's car "swerving all over its lane" and that she smelled of alcohol. (Tr. 59 and 62.) On the body-camera video, two police officers are heard at different times remarking that Tittl was slurring her speech. (City exhibit No. 3.) Tittl, who has lived in Lakewood for 20 years, told police that they were stopped on Clifton Boulevard when they were actually stopped on Detroit Avenue. She also told Halas that she was coming from Planet Fitness in Lakewood, but there was no Planet Fitness in Lakewood, and Tittl was not dressed in "gym-style" attire. (Tr. 75.) She was wearing jeans, a sweatshirt, and a flashing shamrock necklace on St. Patrick's Day. (City exhibit No. 3.)

{¶ 50} Tittl had difficulty following Halas's clear instructions when performing the field-sobriety tests. Moreover, her performance on the field-sobriety tests revealed many clues indicative of intoxication. Therefore, even if Tittl suffers from Graves' disease, POTS, and long Covid, the overwhelming evidence established that she was operating a vehicle while under the influence of alcohol. Therefore, Tittl's OVI conviction is not against the manifest weight of the evidence.

{¶ 51} The third assignment of error is overruled.

{¶ 52} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Lakewood Municipal Court to carry this judgment into execution. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., and
DEENA R. CALABRESE, J., CONCUR