[Cite as *Cleveland Intenatl. Fund-Med. Mart v. Optima 777, L.L.C.*, 2023-Ohio-715.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CLEVELAND INTERNATIONAL
FUND MEDICAL MART, ET AL.,                          :

      Plaintiff-Appellee,                          :

                                  No. 111616

      v.                          :

OPTIMA 777, LLC, ET AL.,                          :

      Defendant-Appellant.                          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED
**RELEASED AND JOURNALIZED:**  March 9, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-20-938197

---

### *Appearances:*

Thrasher, Dinsmore & Dolan, LPA, Ezio A. Listati, and
Elizabeth E. Collins, *for appellee* Tim L. Collins.

Ulmer & Berne LLP, Amanda Martinsek, and Gregory C.
Djordjevic, *for appellees* Cleveland International Fund
and the Huntington National Bank.

Buckley King LPA, David A. Kunselman, and Steven J.
Miller, *for appellant*.

MARY EILEEN KILBANE, J.:

{¶ 1} Defendant-appellant Optima 777, LLC, ("Optima") appeals from the trial court's June 9, 2022 order that authorized the Receiver, Tim L. Collins, ("Collins" or "Receiver") to sell substantially all of Optima's assets and to assume and assign select contracts. The primary asset involved in the sale was the Cleveland Westin Hotel ("Westin" or "hotel" or "property"). For the following reasons, we affirm the lower court's ruling.

**Factual and Procedural History**

{¶ 2} In 2011, Optima borrowed $36 million through a complex bond transaction from plaintiffs-appellees Cleveland International Fund-Medical Mart Hotel, Ltd. ("CIF-MM") to refurbish and renovate the Westin. The parties executed forbearance agreements in February 2019, September 2019, and June 2020.

{¶ 3} On October 2, 2020, pursuant to Optima's default on the bond transaction and forbearance agreements, CIF-MM and the Huntington National Bank filed a complaint naming as defendants Optima, Cleveland-Cuyahoga County Port Authority, the city of Cleveland, and the county of Cuyahoga.[1] Generally, CIF-MM sought repayment on the bonds and note guaranteed by the Westin. On

---

[1] This appeal concerns only CIF-MM and Optima and, therefore, we will not address the other parties' allegations and defenses.

December 31, 2020, Optima filed an answer and counterclaim, and Optima subsequently filed a supplemental, restated, and amended counterclaim.

{¶ 4} On March 8, 2021, CIF-MM filed an emergency motion of appointment of a receiver over Optima and the hotel. CIF-MM argued (1) the hotel was in imminent danger of closing because Optima lacked sufficient funds to continue operations; (2) Optima owed over $1.5 million in delinquent property taxes and almost $1 million on a loan to the city of Cleveland; (3) the hotel was operating at a deficit and had fallen into a state of disrepair; and (4) Optima's principal was under investigation by the Department of Justice for money laundering. CIF-MM further argued a $6 million infusion of capital was necessary to prevent the immediate closing of the hotel, and it secured debt financing for that amount contingent upon the trial court's appointment of a receiver. On March 12, 2021, Optima opposed the appointment of a receiver. A hearing was held, and on March 18, 2021, the trial court issued an order finding that it was necessary and appropriate to appoint a receiver.

{¶ 5} The trial court appointed Collins as the receiver. Collins held weekly management/owner meetings where financial and operational reports were provided. Participants at those meetings included Collins, representatives of CIF-MM and Sage Hospitality — Westin's management company in charge of the Westin's operations — and Optima's titled owner but not its litigation counsel.

{¶ 6} Collins's first responsibility as receiver was to ascertain the market value of the hotel. Collins obtained property valuation and marketing proposals

from five experienced hotel brokers. The proposals were prepared between March and May 2021, ranged in value from $37.5 million to $47.5 million, and offered various marketing strategies. Collins received input from representatives of CIF-MM, Sage Hospitality, and Optima, and he concluded a targeted sale rather than a public sale was the best option.

{¶ 7} Based upon the submitted proposals, Collins selected CBRE as the broker to market and facilitate the sale of the hotel. Collins considered CBRE the largest and most sophisticated commercial real estate company in the United States, with the best connections. Additionally, CBRE had a hotel group that specialized in hotel sales. Collins executed a listing agreement with CBRE on July 14, 2021, and the parties promptly initiated a marketing plan. CBRE listed the Westin in its book of sales for the July 26, 2021 America's Lodging Investment Summit in Los Angeles — the largest hotel investment conference in the world.

{¶ 8} To facilitate the sale of the property, Collins opted for a stalking horse contract. A stalking horse contract encompasses an initial bid by a purchaser — the stalking horse purchaser — who sets the minimum bid that other prospective bidders must exceed or best to acquire the assets being sold. The sale was subject to bidding and sale procedures incorporated into the stalking horse contract. Collins testified that he preferred a stalking horse contract for the Westin because it guaranteed a minimum, material offer for the hotel while he and CBRE continued to solicit higher and better offers. Collins also testified that the stalking horse contract and its associated minimum bid were preferred because the hospitality

industry was negatively impacted by the Covid-19 pandemic, the duration of that economic downturn was unknown, and astonishingly Cleveland was not a destination location that generated significant tourism.

{¶ 9} Collins negotiated a Sale and Purchasing Agreement, herein referenced as a stalking horse contract, between CIF-MM and HEI Hospitality Management, LLC ("HEI" or "Stalking Horse Purchaser") whereby HEI, as the stalking horse purchaser, pledged to purchase the hotel, subject to the contract's terms and conditions, for the price of $39.6 million. In consideration of HEI's agreement to act as the stalking horse purchaser and provide a minimum purchase price for the hotel, the stalking horse contract incorporated bid protections for HEI.

{¶ 10} In conjunction with the CBRE Listing Agreement and the stalking horse contract, CBRE sent emails to 640 targeted prospective purchasers about the sale. In response, 240 emails were opened, and 60 entities indicated their interest as potential bidders. Those 60 entities signed nondisclosure agreements that granted them access to CBRE's managed data room — a database fully populated with confidential information regarding the financial and physical condition of the Westin. Of those 60 entities, 24 indicated interest in purchasing the Westin.

{¶ 11} On August 9, 2021, Collins filed a motion stating the stalking horse contract, bidding procedures, and CBRE Listing Agreement met the requirements of R.C. 2735.04(D) and sought the trial court's approval of the agreements. On August 27, 2021, Collins filed an expedited motion to approve the agreements. On September 14, 2021, Optima opposed CIF-MM's motion to approve the three

documents and filed Matthew Wilk's ("Wilk") expert report in support of its position. On September 17, 2021, CIF-MM filed with the court M. Colette Gibbons's ("Gibbons") expert report in support of its motion to approve the agreements.[2] On September 20, 2021, the trial court held a hearing on the pending motion and, on the next day, granted Collins's motion to approve the stalking horse contract, CBRE Listing Agreement, and bidding procedures. In accordance with the agreements, bids were due on September 24, 2021.

{¶ 12} On September 23, 2021, non-party BCG Land Company ("BCG") filed an emergency motion to participate in the bidding process; the court granted the motion on September 30, 2021. On that same date, the trial court extended the deadline for the submission of competing bids to October 1, 2021, and all related dates in the bidding procedure accordingly. By October 1, 2021, four sophisticated hotel companies, including HEI, had demonstrated their interest to purchase the Westin and provided documentation that established they were able to finance the purchase of the Westin and manage the operations of Westin should they successfully acquire the hotel.

{¶ 13} On October 21, 2021, Optima filed a notice of appeal in *Cleveland Internatl. Fund Med. v. Optima 777, LLC,* 8th Dist. Cuyahoga No. 110930 ("Optima's first appeal"), pursuant to the trial court's approval of the stalking horse contract, CBRE Listing Agreement, and bidding procedures. Despite the filing of

---

[2] Gibbons's rebuttal expert report dated May 18, 2022, was also subsequently submitted to the trial court.

Optima's first appeal, Collins filed on October 26, 2021, a motion for an order approving the terms and conditions of the stalking horse contract and related agreements, and on November 9, 2021, Optima filed a brief in opposition to that motion. On November 15, 2021, the trial court held CIF-MM's motion in abeyance until resolution of the pending appeal.

{¶ 14} On December 2, 2021, in Optima's first appeal, this court found that (1) the trial court's order approving the stalking horse contract and related agreements was an interim order as to the procedure to be followed when conducting the sale, and (2) the order did not foreclose Optima's future right to appeal the sale of the hotel. Thus, this court dismissed Optima's appeal for lack of a final appealable order. The Ohio Supreme Court denied jurisdiction of the case in *Cleveland Internatl. Fund Med. Mart Hotel v. Optima 777, L.L.C.*, 165 Ohio St.3d 1542, 2022-Ohio-397, 180 N.E.3d 1176. On April 11, 2022, the trial court reinstated the case on its active docket.

{¶ 15} On May 23, 2022, the trial court held a hearing on Collins's motion for an order authorizing him to sell the Westin to HEI. The written declarations of Optima's expert witness, Wilk, and the expert reports of CIF-MM's expert witness, Gibbons, were admitted into evidence without objection, and Collins presented testimony. Collins testified to his receipt of broker valuations for the Westin ranging in value from $37.5 million to $47.5 million, his evaluation of marketing plans for the Westin, and his execution of the CBRE Listing Agreement, the stalking horse contract, and the bidding procedures. Collins further testified that pursuant

to the stalking horse contract, each bid had to exceed HEI's bid by $1.1 million for a minimum bid of $40.7 million. This amount fell within the broker's valuations of the property that were in the range of $37.5 million to $47.5 million. Collins stated that bidders had to assume a state energy loan and a city of Cleveland loan associated with the hotel, that amounted to $2,747,000. Collins stated that HEI was not obligated to increase the terms of its offer. Collins testified that bids were presented by BCG, Schulte, and HEI.

{¶ 16} Collins testified that BCG presented a bid that did not comply with the stalking horse contract. Despite Collins's attempts to ensure compliance with the bidding procedures, BCG's bid was never brought up to compliance. Collins also testified he had reservations about BCG's ability or willingness to close the deal since the company recently had not closed another hotel deal in the Cleveland market. Collins testified that Schulte offered $40.7 million but requested representations and warranties standard in the commercial real estate setting but not offered in the stalking horse contract. Collins communicated with Schulte but was unable to reach an agreed resolution. Once the bids from BCG and Schulte were no longer viable options, HEI offered to purchase the hotel at $39.6 million. Collins countered the offer and HEI presented a cash offer of $40.2 million, plus assumption of the two outstanding loans on the property, resulting in a deal worth $42,947,000. Based upon HEI's cash offer that was within the brokers' original range of valuations, HEI's ability to capitalize the deal, and HEI's ability to assume

hotel operations, Collins concluded HEI was the appropriate purchaser and filed a motion with the trial court seeking authority to sell the property to HEI.

{¶ 17} On June 8, 2022, the trial court conducted a related hearing to discuss the redemption amount and redemption period that would apply upon an issuance of a sale order. On June 9, 2022, the trial court issued an order authorizing Collins to sell substantially all of Optima's assets and to assume and assign certain contracts.

{¶ 18} On June 10, 2022, Optima filed the following motions: motion for 24-hour extension of the redemption deadline; motion to stay execution of the sale pending appeal; and the instant appeal pursuant to the trial court's June 9, 2022 order that authorized the receiver to sell substantially all of Optima's assets and assume and assign certain contracts. On June 13, 2022, the trial court denied Optima's motion to extend the redemption deadline, and on June 14, 2022, it denied Optima's motion to stay execution of the sale order.

{¶ 19} On June 15, 2022, in this court, Optima filed an emergency motion to stay the sale order, including the date of redemption. On that same date, this

court granted Optima's emergency motion to stay that would become effective upon the posting of a supersedeas bond. At no time did Optima file a supersedeas bond.[3]

{¶ 20} Optima's appeal presents a single assignment of error for our review:

> Assignment of Error I: The Trial Court committed reversible error in issuing a Journal Entry authorizing the Appellee-Receiver to sell substantially all of Appellant's assets and assign certain contracts.

**Legal Analysis**

{¶ 21} In its sole assignment of error, Optima argues the trial court's June 9, 2022 journal entry that authorized Collins to sell substantially all of Optima's assets and assign certain contracts constituted reversible error. Specifically, Optima argues that the sale did not maximize the property to the receivership estate and the sale was not reasonable under the circumstances.

{¶ 22} In accordance with Ohio's receivership statutes, trial courts must demonstrate sound judicial discretion in their oversight of a receivership. *State ex rel. Yost v. Summer Rays, Inc.*, 10th Dist. Franklin Nos. 18AP-929 and 19AP-133, 2019-Ohio-3907, ¶ 11, citing *State ex rel. Celebrezze v. Gibbs*, 60 Ohio St.3d 69, 74, 573 N.E.2d 62 (1991). R.C. 2735.04 specifies the powers of a receiver, including the sale of real property. With court approval and supervision,

> a receiver may sell property free and clear of liens by private sale pursuant to a written contract between the receiver and the prospective

---

[3] On June 15, 2022, Optima filed a motion for emergency stay and notice of appeal with the Ohio Supreme Court in *Optima 777, L.L.C. v. Collins*, 167 Ohio St.3d 1409, 2022-Ohio-2083, 188 N.E.3d 1105. On June 21, 2022, the Ohio Supreme Court denied the motion for emergency stay for want of four votes. *Id.* On August 9, 2022, the Ohio Supreme Court dismissed the appeal for failure to prosecute. *Optima 777, L.L.C. v. Collins*, 167 Ohio St.3d 1477, 2022-Ohio-2743, 192 N.E.3d 499.

purchaser, by private auction, by public auction, or by any other method that the court determines is fair to the owner of the property and all other parties with an interest in the property, is reasonable under the circumstances, and will maximize the return from the property to the receivership estate, taking into account the potential cost of holding and operating the property.

R.C. 2735.04(D)(1)(a).

{¶ 23} We review a trial court's order that approves a receiver's sale of property for an abuse of discretion. *Yost* at ¶ 12, citing *Lucas v. Reywal Co., L.P.*, 2019-Ohio-27, 118 N.E.3d 505, ¶ 19 (10th Dist.), citing *Yidi, L.L.C. v. JHB Hotel, L.L.C.*, 2017-Ohio-1285, 88 N.E.3d 534, ¶ 7 (8th Dist.). "'Abuse of discretion will not be found where the reviewing court simply could maintain a different opinion were it deciding the issue de novo, but rather represents an attitude that is unreasonable, arbitrary, or unconscionable.'" *Yost* at ¶ 11, quoting *McGee v. C&S Lounge*, 108 Ohio App.3d 656, 659, 671 N.E.2d 589 (10th Dist.1996); *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463.

{¶ 24} A thorough review of the record demonstrates the trial court's June 9, 2022 order authorizing and confirming the hotel's sale maximized the return from the property to the receivership estate and was reasonable. The hotel was losing at a minimum $100,000 per month. While Optima argued continued holding of the Westin — rather than its sale — would result in operational profit or a higher sale price, the trial court did not find this argument compelling. The trial court viewed Optima's expert reports prepared by Wilk and CIF-MM's expert reports submitted by Gibbons in response to Wilk's declarations. It was the trial

court's role to determine the weight to be accorded those reports. *Apicella v. PAF Corp.*, 17 Ohio App.3d 245, 249, 479 N.E.2d 315 (8th Dist.1984), citing *McKay Machine Co. v. Rodman*, 11 Ohio St. 2d 77, 82, 228 N.E.2d 304 (1967).

{¶ 25} Further, Collins's testimony detailed his approach to the sale and marketing of the Westin and his decision to pursue a stalking horse contract with HEI and a listing agreement with CBRE. Collins determined a stalking horse contract with a committed purchaser was the best option in the post-Covid hospitality industry. The final negotiated sale price was within the range of values stated by the five brokers in the spring of 2021. Optima's argument that the valuations were stale, and the trial court was obligated to demand new appraisals was unsupported by R.C. 2735.04. The statute did not require the trial court to seek additional offers, but stated a court may require additional offers "if warranted by the circumstances." R.C. 2735.04(D)(1)(c). Based upon Collins's methodical approach to the marketing and sale of the Westin, the circumstances did not indicate the need for additional offers. Additionally, the trial court provided the parties regular opportunities to be heard throughout the duration of the case and issued detailed journal entries demonstrating the court's understanding of the ongoing concerns. As stated by Gibbons in her initial report, a receiver does not act as a Lone Ranger; Collins's decision to pursue a stalking horse contract and the ultimate sale transaction required the trial court's approval and supervision. *See* R.C. 2735.04(D)(1)(a). The trial court's authorization to sell the hotel to HEI

satisfied the requirements of R.C. 2735.04(D)(1)(a) and did not demonstrate an abuse of discretion.

{¶ 26} Optima's assignment of error is overruled.

{¶ 27} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

EILEEN A. GALLAGHER, P.J., and
EILEEN T. GALLAGHER, J., CONCUR