[Cite as *State v. Thompson*, 2023-Ohio-3358.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                 :          No. 112042

    v.                           :

JOHN THOMPSON,                          :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** September 21, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-00-396442-ZA

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Daniel T. Van, Assistant Prosecuting Attorney, *for appellee.*

Rufus Sims, *for appellant.*

MARY EILEEN KILBANE, J.:

{¶ 1} Defendant-appellant John Thompson ("Thompson") appeals from the trial court's denial of his motion for a new trial. For the reasons that follow, we reverse and remand.

**Factual and Procedural History**

{¶ 2} In February 2001, a jury found Thompson guilty of three counts of rape in violation of R.C. 2907.02. He was sentenced to life imprisonment and classified as a sexual predator.

{¶ 3} Thompson's son, C.W., was seven years old at the time of Thompson's 2001 trial. C.W. testified at Thompson's trial that Thompson engaged in sexual conduct with him on three separate occasions. C.W. testified that Thompson performed fellatio on his private parts and told C.W. not to tell his mother, M.W. After the third occasion, C.W. told M.W. about all three incidents. At the time, M.W. was employed as a county social worker and was under investigation related to allegations that she was selling drugs out of her home and that C.W. was sexually acting out with another boy who lived in the neighborhood.

{¶ 4} Thompson filed a direct appeal challenging his convictions and sentence and a petition for postconviction relief based on ineffective assistance of counsel. In Thompson's direct appeal, this court affirmed his convictions and sentence. *State v. Thompson*, 8th Dist. Cuyahoga No. 79334, 2002-Ohio-5957 ("direct appeal"). On June 20, 2002, the trial court denied Thompson's petition for postconviction relief. Subsequently, this court affirmed the trial court's denial of his first petition for postconviction relief. *State v. Thompson*, 8th Dist. Cuyahoga No. 81573, 2002-Ohio-6845.

{¶ 5} On April 20, 2020, Thompson filed a motion for leave instanter to file a delayed motion for a new trial. In this motion, he argued that on October 28, 2019,

C.W. recanted his trial testimony from the 2001 jury trial. Thompson attached an affidavit to his motion in which C.W. averred that Thompson was innocent. Specifically, C.W. averred that beginning when he was two or three years old, he was sexually molested by a male cousin who was five or six years older than C.W. The abuse was ongoing for several years. When C.W. finally told his aunt, the cousin's mother, about the abuse, his aunt got extremely upset. Subsequently, the cousin approached C.W. and told him to say that someone else had molested him. The affidavit states, "Being afraid of [my cousin] and the consequences of it all, and honestly, not wanting what I had going on with my cousin to end, I lied and said my father John Thompson had molested (raped), me." At Thompson's criminal trial, seven-year-old C.W. described three incidents in which Thompson came up to him, lowered C.W.'s pants, and sucked on C.W.'s penis. All three alleged incidents took place in different rooms at the house that Thompson shared with his mother and brother.

{¶ 6} C.W. also avers that he told his close friends, a professor, his mother M.W., his brother, and his sister that Thompson did not rape him. C.W. confided in his graduate school professor because he considered this person to be a mentor and, at the time, the professor was also enrolled in law school. Eventually, C.W. spoke to Thompson's original trial counsel, who told him that it was his fault for waiting so long. He also reached out to the Innocence Project, who told him that they could not help him. C.W. also contacted the Conviction Integrity Unit at the Cuyahoga County Prosecutor's Office and spoke with investigators about the case.

{¶ 7} On July 10, 2020, the state filed a brief in opposition to Thompson's motion for leave to file a motion for a new trial.

{¶ 8} On March 1, 2021, the trial court denied Thompson's motion for leave to file a delayed motion for a new trial without a hearing. On March 15, 2021, Thompson filed a motion for the court to establish findings of fact and conclusions of law. The trial court ruled this motion moot. Thompson subsequently appealed the denial of his motion for leave to file a delayed motion for a new trial.

{¶ 9} This court reversed and remanded the case, holding that "[b]ecause Thompson submitted evidence that on its face showed he was unavoidably prevented from discovering the evidence sooner, he was entitled to a hearing on his motion for leave." *State v. Thompson*, 8th Dist. Cuyahoga No. 110391, 2021-Ohio-4431, ¶ 14.

{¶ 10} On remand, on January 7, 2022, Thompson filed a motion for a new trial. On February 4, 2022, the state filed a motion to strike Thompson's motion for a new trial, arguing that the motion was not yet ripe because the trial court had yet to hold an evidentiary hearing on Thompson's motion for leave to file a motion for a new trial.

{¶ 11} On February 11, 2022, Thompson filed an amended motion for leave to file a delayed motion for a new trial. On April 15, 2022, the state filed an opposition to Thompson's amended motion for leave. On April 27, 2022, Thompson filed a motion to dismiss his conviction for a violation; an affidavit from his former counsel was attached in support of the motion.

{¶ 12} On April 26, 2022, the trial court ordered the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "agency") to provide the court with "any and all available CCDCFS records" requested by the state related to this case. On June 6 and June 10, 2022, agency prosecutors filed CCDCFS records under seal for the trial court to conduct an in camera review.

{¶ 13} These records contain reports, interview summaries, and other documentation relating to numerous CCDCFS investigations into C.W.'s family in the summer of 2000. The first investigation was the result of a July 19, 2000 intake report in which a neighbor of M.W. contacted CCDCFS and alleged that M.W. was selling drugs out of her home and allowing C.W. to engage in inappropriate sexual behavior with another child in the neighborhood. The subsequent investigation is the result of two separate intake reports. Notably, in an intake report dated August 8, 2000, Thompson contacted CCDCFS and reported a possible sexual assault of C.W. Thompson reported that M.W. had informed Thompson that C.W. had been sexually abused but refused to take him to the doctor and refused to call the police. In a subsequent intake report, dated several days later, M.W. reported that Thompson had sexually abused C.W. M.W.'s report and subsequent investigation led to the arrest in Thompson's underlying criminal case.

{¶ 14} On June 13, 2022, the trial court held a hearing on Thompson's motion for leave to file a motion for a new trial. C.W. testified at this hearing that he was 29 years old and employed at a local school district as a teacher. C.W. identified Thompson as his father and stated that he had not seen his father since

C.W. testified in court against him in 2000. C.W. testified that around that time, he was living with his mother M.W., his brother, his sister, and his grandmother in a house in East Cleveland. C.W. explained that he regularly saw his older male cousins and several other boys who lived up the street. C.W. testified that his cousin was molesting him, and when he told people — social workers or police — that his cousin molested him, his aunt "blew up at him," and shortly thereafter, "my cousin had approached me and said to say it was someone else." C.W. also testified that his cousin ultimately told C.W. to say that his father Thompson had molested him.

{¶ 15} The following exchange occurred between C.W. and Thompson's counsel:

> C.W.: I really, you know, when they came and—when it came up, I originally didn't even say what anything had happened. I don't know who—which group of people that came and talked to me, but they just asked specific questions like what did he do. I filled in the blank. How many times—I'll never forget this conversation. I think it was two white men. How many times did he do it? Where did he do it?
>
> DEFENSE COUNSEL: Now, when you say who —
>
> C.W.: Being my father.
>
> DEFENSE COUNSEL: Is the "he" you're referring to?
>
> C.W.: My father. It was two lawyers that came, or two lawyers — two men came to talk to me, two white men.
>
> DEFENSE COUNSEL: Two men.
>
> C.W.: They asked me questions to see what had happened after I said it was my dad, because I didn't give any details or nothing. I said—I remember questions. He said, What did he do? And I said that he sucked my penis. He said, How many times? I said three. He said, Where? I thought about my grandmother's house. I said, the

bathroom, because I remember the glass doors. I always thought about the glass doors when I was there.

DEFENSE COUNSEL: Okay.

C.W.: I said the basement. She had video games in the basement. And I think I said the bedroom. It was like, green, red lights in the room, just things, you know, stood out in my memory at the time. So three places that just came out of my mouth.

C.W. went on to say that he implicated his father, and when asked why he did so, he stated:

Because my cousin told me to do it. He said he was going to hurt me, hurt my mom. I was kind of foolish enough to believe it at the time.

{¶ 16} C.W. testified that he remembered being nervous testifying at trial at the age of seven. C.W.'s thoughtful testimony reflects that he wrestled with his trial testimony for nearly twenty years. C.W. explained that over a period of several years, he had confided in several people close to him about his testimony and attempted to reach out to several individuals and legal and news organizations who could help him. Having reached several dead ends, in desperation and unsure of where to turn, C.W. posted a YouTube video of his recantation. Ultimately, C.W. testified that he came forward to recant his trial testimony in approximately 2017, when he graduated from graduate school. When asked why it took him that long to come forward, C.W. responded:

I was—different reasons throughout the years. Like nervous, scared, like scared of my dad being angry at me, scared of, you know, me possibly going to jail when I was a kid. Me, just all different sorts of things, you know, fear, you know, from like my family would be—just all different sorts of things. Anything you can imagine I been through.

{¶ 17} C.W. also confirmed that he had not had any direct contact with Thompson since the criminal trial in 2001. He referred to only one occasion, shortly before the hearing on the motion for leave, in which C.W. and his uncle met with Thompson's counsel in advance of the hearing. During the meeting, C.W.'s uncle got a phone call from Thompson, and C.W. and Thompson said hello to each other over the phone. Beyond that, the record reflects that C.W. and Thompson had absolutely no contact with one another whatsoever in the time between the 2000 trial and the 2022 hearing on Thompson's motion for leave to file a motion for a new trial.

{¶ 18} When asked why he decided to come forward to recant his testimony, C.W. responded:

> I mean, it was about time it had to come out. It was either tell the truth or leave this earth. It was at that point.

{¶ 19} On June 17, 2022, Thompson filed a memorandum in support of his motion for leave to file a delayed motion for new trial.

{¶ 20} On June 29, 2022, the trial court granted Thompson's motion for leave to file a motion for a new trial. On July 5, 2022, Thompson filed a motion for a new trial. On August 28, 2022, the state filed a brief in opposition to Thompson's motion for a new trial. On August 30, 2022, Thompson filed a reply brief in support of his motion for a new trial.

{¶ 21} On August 30, 2022, the court held a hearing on Thompson's motion for a new trial. At the beginning of this hearing, the following exchange took place:

DEFENSE COUNSEL: Your Honor, we have also had, as you know, a full hearing on a motion for leave instanter to grant a motion for new trial, which I think this Court did grant.

THE COURT: That's where the young man testified.

DEFENSE COUNSEL: And [C.W.] was also subject to interrogation by the State's two investigators, which you recall there was some controversy about me being present or not being present and that, and I was not present during that interrogation.

So [C.W.] has been vetted thoroughly, Your Honor. He has been cross-examined by the State of Ohio in a hearing before this Court. He has been interrogated by the State's investigators previously, Your Honor.

He has — I think what is important for the Court to know is that nobody prompted [C.W.] to do this affidavit and to come forward with this information.

I didn't even know — I never met [C.W.] until this case evolved, so it is not like somebody said to [C.W.], [C.W.], why don't you do this? You better do this. You should do this and help your father out.

The idea for this whole process came from [C.W.] himself, because it is in the affidavit of materiality, Judge. He said, listen, I was seven years old when I testified. He's...twenty-nine now. So seven years old, Judge, and thirty. So he came of age where he knew that he was compelled and forced and interrogated and intimidated to lie under oath on his own father.

Also the testimony was, Your Honor, and verified in the transcripts, that these alleged individuals who did this intimidation, coercion and threats also threatened to harm his mother as well, Your Honor.

So [C.W.] has lived with this heavy burden for a long time; and during the course of events, Your Honor, and this came out in his testimony before the Court, and it is in the transcripts as well, he went to a number of options to try to seek help.

He went to a professor at his college. He went to, Your Honor, my heroes, the Innocence Project, but even they could not help him. He went to the TV stations. He did a video. He got on the Internet.

He talked to relatives, friends. He did everything he could to come up with some way to get the truth out as to what really happened at this trial when he was seven years old.

Finally he was able to meet up with Miss Bickerstaff and the truth goes on from there. I got involved and became involved representing his dad in this matter. So, Judge, I guess the point I want to make is two things:

Looking at the credibility of [C.W.], I think it is clear that he is a credible person. He's credible, because the idea of coming forward came from him and he said — again, I don't want to repeat myself, but he couldn't live with himself knowing that he lied, putting his father in prison.

Ultimately, defense counsel argued that C.W.'s testimony was material, credible, and would change the outcome of the trial.[1]

{¶ 22} In response, the state argued that C.W.'s summary of the timeline of events in his affidavit does not align with the evidence presented at Thompson's trial.

{¶ 23} On September 14, 2022, the court denied Thompson's motion for a new trial and stated, in relevant part:

In relying on all the evidence, including some of the original trial transcripts, the court cannot find that it is reasonably well satisfied that the trial testimony initially given by the witness was false. The jury, as the trier of fact, deserved the benefit of the doubt in weighing the credibility of each testifying witness at trial, which included both direct and cross-examination. Therefore, the motion for new trial is denied.

{¶ 24} The trial court also denied Thompson's motion to dismiss his conviction for a *Brady* violation.

---

[1] While the record reflects that C.W. was present at this hearing, he did not testify or address the court other than to clarify his age.

{¶ 25} On September 27, 2022, Thompson filed a motion for reconsideration of the trial court's denial of his motion for a new trial. On October 14, 2022, Thompson filed a notice of appeal from the trial court's denial of his motion for a new trial. On October 28, 2022, the trial court denied Thompson's motion for reconsideration.

{¶ 26} Thompson presents three assignments of error for our review:

I. The trial court erred and abused its authority by denying Appellant's motion for a new trial.

II. The trial court erred and abused its discretion by denying without a hearing Appellant's motion to dismiss the conviction regarding a Brady violation [even] with no opposition from the state.

III. The trial court erred and abused its discretion when it denied and rejected C.W.'s recanted testimony which was converted to an affidavit of materiality.

**Law and Analysis**

**I. Motion for a New Trial**

{¶ 27} In his first assignment of error, Thompson argues that the court erred and abused its discretion when it denied his motion for a new trial. In his third assignment of error, he argues that the trial court erred and abused its discretion when it rejected C.W.'s recanted testimony that was presented in an affidavit attached to his motion for a new trial. Because both Thompson's first and third assignments of error deal with the substance of his motion for a new trial, we will address them together.

{¶ 28} Crim.R. 33(A)(6) provides that "[a] new trial may be granted on motion of the defendant for any of the following causes affecting materially the defendant's substantial rights," such as

> [w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

Crim.R. 33(A)(6).

{¶ 29} A Crim.R. 33(A)(6) motion for new trial on the ground of newly discovered evidence may be granted only if that evidence

> "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence."

*State v. Gilbert*, 8th Dist. Cuyahoga No. 106358, 2018-Ohio-3789, ¶ 24, quoting *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

{¶ 30} The decision to grant or deny a motion for a new trial lies within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *Id.* at ¶ 25, citing *State v. Schiebel*, 55 Ohio St.3d 71, 76, 564 N.E.2d 54 (1990). The term abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or

unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983); *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463.

{¶ 31} "Generally, newly discovered evidence that purportedly recants testimony given at trial is 'looked upon with the utmost caution.'" *State v. Nunez*, 8th Dist. Cuyahoga No. 104917, 2017-Ohio-5581, ¶ 35, quoting *State v. Nash*, 8th Dist. Cuyahoga No. 87635, 2006-Ohio-5925, ¶ 10.  An affidavit recanting witness testimony is "'viewed with extreme suspicion because the witness, by making contradictory statements, either lied at trial, or in the current testimony, or both times.'"  *Id.*, quoting *State v. Gray*, 8th Dist. Cuyahoga No. 92646, 2010-Ohio-11, ¶ 29.  Therefore, "'there must be some compelling reason to accept a recantation over testimony given at trial.'"  *Id.*, quoting *State v. Fortson*, 8th Dist. Cuyahoga No. 82545, 2004-Ohio-5387, ¶ 13.

{¶ 32} When evaluating a motion for a new trial based upon a witness's recanted testimony, the trial court must evaluate the credibility of the recanting witness.  *Nunez* at ¶ 36, citing *Toledo v. Easterling*, 26 Ohio App.3d 59, 60, 498 N.E.2d 198 (6th Dist.1985).  If the court determines that the recantation is believable, it must then determine if the recanted testimony would have materially affected the outcome of the trial.  *Id.*, citing *State v. Brown*, 186 Ohio App.3d 309, 2010-Ohio-405, 927 N.E.2d 1133, ¶ 47 (7th Dist.).

{¶ 33} Here, the trial court concluded that it could not find that C.W.'s initial trial testimony was false, and further, that the jury "deserved the benefit of the doubt in weighing the credibility of each testifying witness at trial," including C.W.

Notably, the trial court did not make a determination as to the credibility of C.W.'s recantation. Instead, the trial court stated that it could not find that C.W.'s trial testimony, given at the tender age of seven, was false.

{¶ 34} The state of Ohio argues that C.W.'s recantation is not credible because of alleged discrepancies in his timeline of events. Specifically, the state refers to records from CCDCFS that would contradict C.W.'s recantation. The state alleges that these records would show that CCDCFS "began looking at C.W. because of allegations of another child being touched inappropriately." Further, the state argues that there is no documented encounter in which C.W. would have made allegations against his cousin.

{¶ 35} Having reviewed both the CCDCFS records and the 2000 trial testimony, we find the state's arguments unpersuasive. As an initial matter, the agency records reflect at least one instance in which C.W. identified his cousin as the perpetrator of his sexual abuse.

{¶ 36} Moreover, to the extent that the state points to discrepancies in C.W.'s recantation, we note that our review requires courts to weight the credibility of the recanting witness and determine if the recantation is credible, "thereby impliedly finding the original testimony was not credible." *State v. Meek*, 10th Dist. Franklin No. 16AP-549, 2017-Ohio-9258, ¶ 21, quoting *State v. Woodward*, 10th Dist. Franklin No. 08AP-1015, 2009-Ohio-4213, ¶ 22. Comparing C.W.'s recantation to his 2001 trial testimony, we find that the recantation is extremely credible. Any expectation that C.W.'s recantation would be entirely in lockstep with his decades-

old trial testimony both contradicts the inherent nature of a recantation and imposes an unreasonable and arbitrary expectation on the witness. Further, the state's assertion that there is nothing in the record to corroborate C.W.'s "timeline of events" in his recantation and corresponding 2022 testimony ignores the details of the CCDCFS investigations and C.W.'s own trial testimony. While the state would have us put aside the identity of the person "or perhaps persons" who sexually abused C.W., we note that with the exception of the critical fact that Thompson abused C.W., much of C.W.'s recantation is actually corroborated by the record in this case. Additionally, we note that with respect to the timeline in this case, Thompson's original indictment alleged that the crimes occurred over one 24-hour period. *State v. Thompson*, 8th Dist. Cuyahoga No. 79334, 2002-Ohio-5957. At trial, however, the state's case actually reflected three alleged incidents that occurred at some unknown point throughout the summer of 2000. If the state of Ohio was unable to provide a consistent timeline of events in the immediate aftermath of the incidents, as is entirely reasonable in child sexual abuse cases, it is unreasonable and arbitrary to expect a 29-year-old man to provide a consistent timeline, decades later, of events he is recanting.

{¶ 37} Additionally, with respect to the state's argument that records show that C.W. touched another child inappropriately, it is unclear how these allegations — that a seven-year-old child was sexually "acting out" — tend to make C.W.'s recantation less credible. Finally, we find that any "discrepancies" between C.W.'s recantation and his trial testimony are the natural consequence of the imperfect

nature of human memory. Expecting a witness to recall precise details of numerous interviews and aspects of an investigation that took place decades earlier in order to determine that the witness is credible is unreasonable, generally, and therefore amounts to an abuse of discretion in this case. It is particularly unreasonable when the details took place when the witness was seven years old and therefore unable to comprehend the significance of those details, and when the context of those details was — regardless of any alleged wrongdoing — undoubtedly traumatic for that witness. Our review of the record in this case reveals that numerous investigations took place that summer, with multiple parties making accusations against multiple individuals — neighbors, relatives, and friends alike. The timeline of events that precipitated this case is complex, and the allegations throughout the record are far from straightforward.

{¶ 38} Additionally, we note that this case is unique in that unlike many cases in which a recanting witness was in contact with, or received pressure from, family members and friends of the defendant or the defendant himself, C.W. made the decision to recant independently. This is highlighted by the fact that C.W. went to several trusted individuals and organizations before ultimately getting in contact with his father's attorney. Further, while the recantation came after a significant length of time, this is not necessarily unusual or suspicious given the circumstances. C.W.'s thoughtful testimony reflected that his recantation was not based on a change of heart that happened overnight; it was instead the result of significant and prolonged introspection, because C.W. wrestled with his trial testimony for nearly

20 years. C.W. came forward to recant his childhood testimony after coming of age, completing his education, and attempting to live with the burden of his childhood testimony. Not only does the record reflect that C.W. was not pressured to recant his testimony, it reflects the opposite; C.W. testified that as a child, he received pressure from multiple family members, including his claimed assailant and his aunt, to testify against his father.

{¶ 39} Even viewing C.W.'s recantation with extreme suspicion, we find this to be the exceptional case in which the recantation of the victim-witness warrants reversal because it was unreasonable of the trial court to conclude that the recantation was not credible. C.W. provided a complete and unambiguous recantation of his trial testimony. While the trial court is correct that the jury was in the best position to judge the credibility of the witnesses at Thompson's trial, including C.W., this fact does not relieve the trial court of its obligation to weigh the credibility of C.W.'s recantation. We find it unreasonable for the trial court to have concluded that the testimony of a seven-year-old child, facing threats from older family members, was more credible than the testimony of a 29-year-old teacher.

{¶ 40} For these reasons, we sustain Thompson's first and third assignments of error and reverse and remand the case for a new trial.

{¶ 41} Because we have sustained Thompson's first and third assignments of error and reversed and remanded the case for a new trial, we need not address Thompson's second assignment of error.

{¶ 42} Judgment reversed and case remanded for new trial.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

ANITA LASTER MAYS, A.J., and
SEAN C. GALLAGHER, J., CONCUR