[Cite as *M.H. v. B.S.*, 2026-Ohio-1281.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

| | |
|---|---|
| M.H., SR., | : |
| Plaintiff-Appellee, | : |
| | :     No. 115470 |
| v. | : |
| B.S., | : |
| Defendant-Appellant. | : |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 9, 2026

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DV-25-405016

***Appearances:***

Leslie S. Graske, *for appellee.*

Christopher Thomarios, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} B.S. ("Stepfather") appeals the domestic relations court's judgment entry overruling his objections to the magistrate's decision and concluding that the domestic violence civil protection order ("DVCPO") against him "remains in full

force and effect." For the following reasons, we affirm the judgment of the Cuyahoga County Domestic Relations Court's judgment.

## I.     Facts and Procedural History

{¶ 2} M.H., Sr., ("Father") was previously married to L.S. ("Mother") and they have two minor children, T.H. and M.H., Jr. (collectively, the "Children"). Mother is currently married to Stepfather, who has been in the Children's lives since they were toddlers. In November 2024, a domestic-violence incident occurred involving Stepfather and T.H. Stepfather was charged in municipal court with misdemeanors related to this incident and a temporary protection order against Stepfather was put in place.

{¶ 3} Additionally, the Cuyahoga County Division of Children and Family Services ("CCDCFS") opened an investigation into the incident and ultimately substantiated Stepfather's physical abuse of T.H.

{¶ 4} On May 29, 2025, Stepfather pled no contest to the assault of T.H. related to this incident and the temporary protection order ended. On June 23, 2025, Father filed a petition for a DVCPO against Stepfather seeking to protect the Children. That same day, the court issued an ex parte DVCPO, ordering that Stepfather "shall stay away from" the Children and "not be present within 500 feet" of them. The DVCPO was granted for one year set to expire on June 22, 2026.

{¶ 5} A full hearing on the DVCPO was scheduled for July 2, 2025 but, on June 25, 2025, Father filed a motion to continue. This motion stated as follows regarding the grounds for the request for a continuance: Father "has just retained

. . . counsel, and counsel will be unavailable for this hearing due to being away from her office from June 30, 2025, and returning July 7, 2025." The court granted this motion on June 30, 2025, finding that good cause was shown, and rescheduled the hearing to July 25, 2025.

{¶ 6} On July 13, 2025, Mother and Stepfather married. The Children did not attend the wedding pursuant to the terms of the ex parte DVCPO.

{¶ 7} On July 18, 2025, Father filed a second motion for continuance arguing that service was not yet perfected on Stepfather and one of Father's witnesses was unable to attend the full hearing set for July 25, 2025. On July 22, 2025 the court denied Father's request.

{¶ 8} The court held a full hearing on the DVCPO on July 25, 2025 before a magistrate. On July 29, 2025, the court granted the DVCPO through June 23, 2026, and made the following findings:

> On November 14, 2024, during [Mother's] parenting time, [Stepfather] threw [T.H.] against a wall twice which gave [T.H.] a concussion. [T.H.] hit his head both times. [M.H., Jr.] was present for the assault. [Father] took [T.H.] to the emergency department because [T.H.] was not acting normal when [Father] picked him up and then took him to the police station to report the assault. A referral was made to CCDCFS and after an investigation was conducted, the physical abuse allegation against [Stepfather] with [T.H.] as the victim was substantiated. [Stepfather] did not speak to CCDCFS about the assault.
>
> [Stepfather] was criminally charged for the assault which resulted in a conviction. A domestic violence temporary protection order was put into place on November 18, 2024, and remained in place until the criminal case was resolved. The criminal case was resolved at the end of May 2025.
>
> After the assault, [Father] reported that [T.H.] broke out in hives and began wetting the bed. Further, also after the assault, [T.H.] wrote

concerning things in his journal about wanting to die, he is a disappointment to his family, and he would understand if his family hated him.

[A CCDCFS representative] spoke with [Mother] and found that [Mother] was dismissive of what [T.H.] had reported. [Mother] minimized what took place, which meant to [the CCDCFS representative] that she had a lack of protective capacity.

There was evidence of other incidents between [Stepfather] and the children. [Stepfather] had hit [T.H.] in the mouth before for talking back to him.

[Mother's] testimony was concerning, as it seems her only concern is that she wants her family back. [Mother] testified that she will not allow her boys to be harmed, but [T.H.] was harmed by [Stepfather] during her parenting time.

{¶ 9} Stepfather filed objections to the magistrate's decision on August 11, 2025 and August 12, 2025. On August 22, 2025, Stepfather filed a notice of appeal of the court's July 29, 2025 order granting of the DVCPO. This notice of appeal was filed before the domestic relations court ruled on Stepfather's objections to the magistrate's decision.

{¶ 10} On September 15, 2025, Stepfather filed supplemental objections to the DVCPO. This filing included citations to the transcript from the July 25, 2025 hearing and law to support Stepfather's objections. Although somewhat unclear from this filing, it appears that Stepfather set forth two objections: first, to the court granting Father's first motion to continue the full hearing, and second, to the court granting the DVCPO because it was not supported by a preponderance of evidence in the record. Specifically, as to the second objection, Stepfather argued that because there was no evidence of abuse after the November 2024 incident, "[i]t was

unreasonable to have found [Stepfather] was still an immediate threat or danger to the [Children] or that [Father] can demonstrate a reasonable present fear of future harm."

{¶ 11} On September 25, 2025, this court remanded the matter to the domestic relations court to rule on Stepfather's objections to the magistrate's decision. On October 15, 2025, the domestic relations court issued a judgment entry overruling Stepfather's objections and ordering that the DVCPO remain "in full force and effect."

{¶ 12} Stepfather appeals, raising the following assignments of error for our review:

> I. The trial court abused its discretion in granting the Appellee a continuance over Appellant's objection when it was filed three days after the ex-parte order was granted.

> II. The trial court erred in granting Appellee a domestic violence civil protection order, finding that Appellee met his burden of showing by a preponderance of the evidence that Appellee's children are in danger of domestic violence.

> III. The trial court abused its discretion by upholding the magistrate's decision determining that Appellee should be granted a domestic violence civil protection order.

## II. July 25, 2025 Hearing Testimony

{¶ 13} Prior to testimony beginning at this hearing, the court established that service of the petition and ex parte DVCPO had not been perfected on Stepfather, and Stepfather agreed to waive service at the hearing.

### A. Shannon Fraser

{¶ 14} Shannon Fraser ("Fraser") testified that she works in the medical and special investigations unit of CCDCFS. Fraser investigates "allegations of physical abuse, neglect, sexual abuse of children, and child fatalities in home settings, also in out of home care settings." Fraser testified that she investigated an allegation of physical abuse of T.H. on November 18, 2024, and learned the following:

> During that investigation, I learned that there were allegations [T.H.] had been physically assaulted by his mother's boyfriend at the time, possibly fiancé, I don't recall exactly. There was an incident while [T.H.] was at his mother's home visiting that he was getting attitude or mouthing off. He reported that the boyfriend started chasing after him up the stairs, grabbed him by the hoodie, and slammed him into the wall two times. It was reported that as a result he sustained a concussion.

{¶ 15} According to Fraser, she interviewed T.H., M.H., Jr., Father, Father's fiancé, Mother, a babysitter, a family friend and the Children's paternal grandmother. Fraser also reviewed T.H.'s medical records which "indicated that he was seen several times for the concussion."

{¶ 16} Fraser testified that her discussions with Mother caused concern within CCDCFS. According to Fraser, Mother "was not aligned with her son is what the agency would, you know, describe that as. She found it difficult to believe that the incident rose to that level." Fraser testified that she found Mother "to be dismissive of [T.H.'s] allegations," to lack "protective capacity" and to minimize the concern.

{¶ 17} Fraser did not interview Stepfather during this investigation because "[u]pon advice of legal counsel he declined to engage with" CCDCFS.

**{¶ 18}** According to Fraser, the Children reported other incidents of abuse by Stepfather that "had been ongoing over the last year or so," including Stepfather hitting M.H., Jr., when the child was five years old.

**{¶ 19}** Fraser testified about entries in T.H.'s journal that concerned her. According to Fraser, they "were negative. There was a lot of guilt, and comments about wanting to die, about disappointing his family. These are not, you know, verbatim, these are what I would call the themes of the journal entries. He talked about how he would understand if his mom hated him. That he was going to starve himself. And the themes were dark and indicative of self harm [sic]." According to Fraser, T.H. was ten years old when he wrote these journal entries.

**{¶ 20}** Fraser also testified about medical records showing that T.H. "had broken out in hives due to stress, and he had also started urinating the bed" since November 14, 2024 incident occurred. According to Fraser, Father reported these issues to her. Fraser testified that, ultimately, CCDCFS substantiated physical abuse of T.H. by Stepfather. This finding was documented and a copy of the report was sent to Father and Mother on December 16, 2024. Fraser testified that, because there was a temporary protection order issued in conjunction with the criminal case against Stepfather and Stepfather "had no further access" to the Children, CCDCFS closed its case.

**{¶ 21}** Under cross-examination, Fraser agreed that T.H.'s journal entries did not state that he wanted to die because of Stepfather. Fraser also testified that she was aware that T.H. was "being teased horribly at school" and that sometimes

children in general journal that they want to die because of this. Fraser clarified, however, that she spoke with T.H. about this and he said he had not been teased at school within the past year.

**B. Nicole Williams**

{¶ 22} Nicole Williams ("Williams") testified that she is a "supervisor of child protection orders and investigators" at CCDCFS, and she is Fraser's supervisor. Williams authenticated the CCDCFS records in this case.

**C. T.H.**

{¶ 23} T.H. testified that he is ten years old, and he lives with Father although sometimes he lives with Mother. When he stayed with Mother, the household included Stepfather, Mother, M.H., Jr., T.H. and their two sisters. According to T.H., on November 14, 2024 Stepfather pushed him "into two walls." T.H. testified as follows about what happened: "I was having a bad day and I was giving a ton of people attitude. And when [M.H., Jr.] called me a cry baby [sic] in the kitchen I threw a toy dog at his head . . . . Then [Stepfather] came in . . . . He pushed me into the wall by the side door."

{¶ 24} Asked if Stepfather put his hands on T.H., T.H. answered, "Yeah." Asked where he was touched, T.H. indicated that Stepfather grabbed the collar of his shirt and pushed him into the wall in the kitchen. T.H. testified that he was wearing his "panda snuggie" at the time T.H. stated that the back of his head and his back hit the wall. T.H. testified that Stepfather let him go and said, "Lose the attitude." T.H. "yelled back" that he did not have an attitude and he then ran up the

stairs. At this time, Stepfather again grabbed T.H. by the collar and pushed him into a wall for the second time. According to T.H., his back and the back of his head hit the wall, again. T.H. testified that both times his head hit the wall, it made a noise like a "bang" and it hurt.

{¶ 25} After this, T.H. went upstairs and texted Father that Stepfather hit him. Father replied to T.H., "I'll talk to your mom. Just try and stay away buddy." Eventually Mother told T.H. to "just relax" and to go to bed, which he did.

{¶ 26} T.H. saw Father two days later. T.H. testified that his "head was hurting really bad" and Father took him to the emergency room on November 17, 2024, where he was diagnosed with a concussion. Father then took T.H. to the police station to file a report. T.H. testified that he threw up in Father's truck after leaving the police station.

{¶ 27} T.H. testified that when he talked back to Stepfather, Stepfather would "lightly slap [him] across the mouth." T.H. testified about a text message he allegedly sent to Father on October 7, 2023, that stated Stepfather "threw me into the counter." T.H. further texted that he was scared. Father replied to T.H. by asking him if Mother knew about this. T.H. texted, "Yes and mom does not care." T.H. testified that he did not remember sending this message. T.H. testified about another message on M.H., Jr.'s phone from May 16, 2024, that read, "Dad it is [T.H.] and [Stepfather] just hit me." T.H. did not recall sending this message, either.

{¶ 28} T.H. testified that when he contacted Father in the past to say that Stepfather hit him, Father told T.H. to stay away from Stepfather. T.H. testified that he tried to do this.

{¶ 29} Under cross-examination, T.H. testified that the day after Stepfather threw him into a wall twice, T.H. played outside on a trampoline "doing flips." T.H. testified that he "ate a lot" that day, which was one day before he was diagnosed with a concussion and threw up in the truck.

{¶ 30} T.H. testified that he did not see Stepfather for a while after this but recently began seeing him again. According to T.H., "[W]e were having a lot of fun. And like a week after, he took me to the mall and we got some Japanese food there." Asked if, while doing the flips on the trampoline, he ever landed on his head, T.H. answered, "No."

{¶ 31} T.H. further testified that during the period of time when he did not see Stepfather (i.e., when the municipal court temporary protection order was in place from November 2024 to May 2025), Stepfather provided him gifts, including a Labubu and a ukulele case.

### D. M.H., Jr.

{¶ 32} M.H., Jr. testified that he is 12 years old and he lives with Father sometimes and Mother and Stepfather sometimes. M.H., Jr. testified, as follows, about what happened on November 14, 2024:

> So I was watching a show Nick at Nite. [T.H.] was getting angry because he was losing to our little sister in a matching game.
>
> . . .

So he was getting frustrated, and he was also tired. Then I called him sore loser and he got mad at me, so he threw something at me.

. . .

Then [Stepfather] came in and like tried to fix the situation, and [T.H.] started yelling and started arguing. And then he pushed [T.H.] into the wall.

I didn't see it, I just heard it because I was on the floor actually after getting hit by a little toy dog in the head.

. . .

And then [T.H.] was mad running away storming. And then he ran up the stairs and [Stepfather] was like, Quit your attitude. [T.H.] said he didn't have an attitude and like yelled it. So then he ran upstairs. [Stepfather] went up there again, and like said, Why do you have the attitude and why are you yelling at everyone. And then mom came in like settle it down.

[T.H.] went upstairs and texted our dad and said like oh [Stepfather] hit me. And then I was downstairs with my sister just sitting there after hearing all the commotion. [T.H.] went to bed. I went up there. He was already sleeping, and yeah.

{¶ 33} M.H., Jr. testified that he recalled one other time that Stepfather hit T.H. on the mouth "so they would stop going back and forth just talking." M.H., Jr. was shown a screenshot of a text message dated May 16, 2024 from his phone to Father's phone that read, "Dad it is [T.H.] and [Stepfather] just hit me." M.H., Jr. testified that T.H. "sometimes" would use his phone if T.H.'s phone "dies or something," but M.H., Jr. did not recall anything about this particular message or T.H. getting hit that day. Another text message from M.H., Jr.'s phone to Father's phone that same day reads, "It is [M.H., Jr.] [T.H.] was laughing at [Stepfather]

w[h]en he was talking." M.H., Jr. testified that he did not remember anything about this.

{¶ 34} M.H., Jr. was asked if he recalled telling the CCDCFS "worker" that Stepfather hit him when he was five. M.H., Jr. answered, "No. I don't remember saying I ever got hit." He further testified that everything he told the "worker" was the truth.

{¶ 35} Under cross-examination, M.H., Jr. was asked about the weekend of November 14, 2024. M.H., Jr. testified as follows: "We went to my dad's. [T.H.] wasn't feeling good. He looked like he was sick. We went to a birthday party at our uncles. [sic] [T.H.] was like sleeping randomly and he never takes naps." Asked if he recalled T.H. jumping on a trampoline, M.H., Jr. answered, "No."

{¶ 36} M.H., Jr. testified that it has been "good" since they began seeing Stepfather again, and it "feels like back to normal again." According to M.H., Jr., he does not fear being around Stepfather, and he never had any problems with Stepfather. M.H., Jr. further testified that he thinks Father does not like Stepfather.

### E. Father

{¶ 37} Father testified that he obtained a temporary protection order against Stepfather when he found out that Stepfather threw T.H. into a wall twice on November 14, 2024. According to Father, T.H. was not feeling well and fell asleep at a birthday party. M.H., Jr. told Father that he "heard a commotion" when Stepfather "pushed or threw [T.H.] into a wall and then chased after him and threw him into the wall again."

**{¶ 38}** According to Father, the temporary protection order was in effect from November 18, 2024 to May 29, 2025, when Stepfather's assault case ended. Father testified that he obtained the DVCPO to protect the Children from "[a]buse and being hurt" by Stepfather. Father testified that he received a notice from CCDCFS substantiating that Stepfather physically abused T.H. According to Father, he has received approximately three text messages from the Children that they, or at least one of them, have been hit by Stepfather. On October 7, 2023, T.H. messaged Father that Stepfather threw T.H. into a counter. Father testified that he messaged Mother the same day to ask what was going on between T.H. and Stepfather. Mother texted father three days later but did not respond to Father's question. According to Father, Mother did not respond to his question via any other means either. Father testified that he fears for the safety of the Children, because he believes "it will happen again."

**{¶ 39}** According to Father, he contacted Mother "over the phone" after learning of the November 14, 2024, incident, and Mother was "very dismissive." Father picked the Children up on November 17, 2024, from Mother's scheduled parenting time. He testified as follows about what happened next:

> When I picked [T.H.] up he was acting a little sluggish, tired, not normal. Told him we were going to Uncle Rich's kid's birthday party. He said okay. When we got to the birthday party, he fell asleep in the middle of it. It was very loud in there, kids playing, and he wasn't eating, fell asleep, and I had cause for concern. That's when I found out the extent of what actually happened on November 14th.

{¶ 40} Father testified that he took T.H. to the emergency room where T.H. was diagnosed with a concussion. Father then took T.H. to the police department to file a report and obtain a temporary protection order against Stepfather. According to Father, Stepfather gave gifts to the Children while the temporary protection order was in place. Father testified that he has been unsuccessful in having Mother intervene on the Children's behalf, and he feels that a protection order is the only way to keep the Children safe from Stepfather.

{¶ 41} Under cross-examination, Father was asked about the time lapse from May 29, 2025, when the temporary protection order ended, to June 23, 2025, when he filed the petition for this DVCPO. According to Father, he needed guidance from his lawyer, who was not available until the DVCPO was filed. Father was also asked about the trampoline that T.H. allegedly jumped on during the weekend of the November 14, 2024, incident. Father answered, "[T]his is the first I've heard of it."

### F. Mother

{¶ 42} Mother testified in Stepfather's case-in-chief about how the Children have been acting since Father filed the petition for this DVCPO: "My boys are heartbroken. They don't understand why this is happening again. They don't understand how our family is torn apart again." Mother further testified that Father was "absolutely" trying to ruin her wedding to Stepfather. According to Mother, after the temporary protection order ended in late May 2025, the "family dynamic" was "[p]eaceful and happy" until the petition for this DVCPO was filed on June 23, 2025. "My kids all cried the day [t]he last protection order was terminated."

{¶ 43} Mother denied that Stepfather bought Easter gifts for the Children. Asked if she would do anything to harm the Children, Mother responded, "You're a parent, can't keep them out of harm." Asked if she would allow the Children to be harmed, Mother answered, "No, I would not." Asked what she wanted to "happen here," Mother said, "I want peace for my kids. I want my kids to be in a happy, healthy home all of us together. I want to move on and not traumatize them anymore. And I want my family to be whole again."

{¶ 44} Mother explained that, during the pendency of the temporary protection order and this DVCPO, she and her daughters lived in their home and Stepfather and the Children would rotate residences. "So [Stepfather] would come and stay at our house when the [Children] were with [Father], and then [Stepfather] would live at his mom's house when the [Children] were with me."

{¶ 45} Under cross-examination, Mother testified that she received a letter from CCDCFS substantiating physical abuse of T.H. by Stepfather and, despite this, she married Stepfather seven months later.

## III. Law and Analysis

### A. Motion for Continuance

#### 1. Standard of Review

{¶ 46} Whether to grant a continuance is a matter left to the discretion of the trial court. *In re A.M.N.*, 2022-Ohio-2048, ¶ 7 (8th Dist.). An abuse of discretion is "a court exercising its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

## 2. Law

{¶ 47} Pursuant to R.C. 3113.31(D)(2)(a), if the court issues an ex parte DVCPO, "the court shall schedule a full hearing for a date that is within seven court days after the ex parte hearing . . . . The court shall give the respondent notice of, and an opportunity to be heard at, the full hearing." Furthermore, the court may grant a continuance of the full hearing for any of the following reasons:

> (i) Prior to the date scheduled for the full hearing under this division, the respondent has not been served with the petition filed pursuant to this section and notice of the full hearing.
>
> (ii) The parties consent to the continuance.
>
> (iii) The continuance is needed to allow a party to obtain counsel.
>
> (iv) The continuance is needed for other good cause.

*Id.*

{¶ 48} In *State v. Unger*, 67 Ohio St.2d 65, 67-68 (1981), the Ohio Supreme Court set forth the following factors courts should consider regarding motions for continuance:

> In evaluating a motion for a continuance, a court should note, inter alia: the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived, whether the defendant contributed to the circumstance which gives rise to the request for a continuance, and other relevant factors, depending on the unique facts of each case.

## 3. Analysis

{¶ 49} In his first assignment of error, Stepfather argues as follows: "As stated in [R.C.] 3113.31(D)(2), the trial court had no right to grant a continuance of

the full hearing before [Stepfather] was allowed to defend himself." As shown above, however, this is not what R.C. 3113.31(D)(2) states. The statute specifically states that the court may grant a continuance for lack of service or good cause shown, both of which apply in this case. Although Stepfather knew about this action as early as June 30, 2025, as evidenced by his attorney filing a notice of appearance on his behalf on this day, Stepfather was not formally served with the petition and ex parte DVCPO until the day of the rescheduled hearing on July 25, 2025. This is verified in the record by an "Acknowledgement of Service" signed by Stepfather on July 25, 2025, and filed with the court on July 28, 2025. Additionally, the court's journal entry granting Father's first request for a continuance states "good cause shown," and the motion explains that Father's counsel, who filed a notice of appearance on June 25, 2025, two days after Father filed the petition pro se, was unavailable for the first scheduled hearing.

{¶ 50} In applying the *Unger* factors, we find that the length of delay between the first set hearing and the rescheduled hearing was 23 days. No other continuances had been granted in this case and, in fact, the court denied Father's second motion for continuance. On appeal, Stepfather sets forth neither evidence nor argument regarding inconvenience to litigants, witnesses, counsel and the court. The reasons for requesting and granting the continuance were lack of service and counsel being unavailable for the originally scheduled hearing.

{¶ 51} In *R.J.L. v. K.R.,* 2019-Ohio-3667 (8th Dist.), this court found no abuse of discretion when the domestic relations court granted a two-week

continuance of the full hearing on a DVCPO. "Regardless of whether appellant consented to the continuance, the trial court has authority under R.C. 3113.31(D)(2)(a)(iv) to grant a continuance of the full hearing to a reasonable time if it determines that the continuance is 'needed for other good cause.' Further, a court has supervisory control over its own docket and has the inherent authority to manage its own proceedings and grant continuances." *Id.* at ¶ 19. *Compare C.M.R. v. B.T.B.S.*, 2023-Ohio-1973, ¶ 12 (8th Dist.) ("Where the granting of a continuance is necessary to allow a party a reasonable opportunity to obtain counsel or to otherwise prepare his or her case, the denial of a request for a continuance may violate a party's right to due process.").

{¶ 52} Upon review, we find no abuse of discretion in the trial court's granting Father's first motion for continuance. Stepfather's first assignment of error is overruled.

### B. Domestic Violence Civil Protection Order

#### 1. Standard of Review

{¶ 53} "When a respondent argues that the trial court erred in issuing a [DVCPO], the question on appeal is whether there was sufficient credible evidence to support a finding that the respondent had engaged in acts or threats of domestic violence." *S.H.B. v. M.W.L.*, 2021-Ohio-3929, ¶ 13 (8th Dist.).

#### 2. Law

{¶ 54} To grant a DVCPO under R.C. 3113.31(D), "the trial court must find that petitioner has shown, by a preponderance of the evidence, that petitioner or

petitioner's family are in danger of domestic violence." *S.H.B. v. M.W.L.,* 2021-Ohio-3929, ¶ 13 (8th Dist.). "Domestic violence" is defined, in part, in R.C. 3113.31(A)(1)(a)(iii) as follows: "The occurrence of . . . the following . . . against a family or household member: Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code . . . ." Pursuant to R.C. 2151.031(D), an abused child includes any child who "[e]xhibits evidence of any physical . . . injury . . . inflicted other than by accidental means . . . ." *See C.A.P. v. M.D.P.,* 2021-Ohio-3030, ¶ 28 (8th Dist.) (affirming the court's granting a DVCPO when "the court found that [the respondent] committed domestic violence against [the child] based on child abuse" under R.C. 2151.03(D)).

{¶ 55} Pursuant to Civ.R. 65.1, which governs civil protection orders, including DVCPOs, a party filing objections to a DVCPO "has the burden of showing that an error of law or other defect is evident on the face of the order, or that the credible evidence of record is insufficient to support the granting or denial of the protection order, or that the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order." Civ.R. 65.1(F)(3)(d)(iii).

### C. Analysis

{¶ 56} In his second and third assignments of error, Stepfather argues that there is insufficient evidence that the Children "are in danger of domestic violence" or are in danger of "imminent physical harm." Stepfather cites *M.H. v. J.H.,* 2015-

Ohio-5178 (9th Dist.), *Solomon v. Solomon*, 2004-Ohio-2486 (7th Dist.) and *K.B. v. B.B.*, 2017-Ohio-71 (9th Dist.) to support his theory that "[i]t was unreasonable to have found [Stepfather] was still an immediate threat or danger to the [Children] or that [Father] can demonstrate a reasonable present fear of future harm." According to Stepfather, these three cases stand for the proposition that past acts of domestic violence do not warrant a present DVCPO.

{¶ 57} Our review of *M.H., Solomon* and *K.B.* shows that Stepfather misconstrues these cases' holdings and fails to distinguish the facts of these cases from the evidence presented in this case. In all three cases cited by Stepfather, the petitions for DVCPOs were not based on recent domestic-violence incidents. In this case, however, the petition for the DVCPO was the result of one domestic-violence incident that occurred approximately seven months prior to filing the petition and during these seven months, a temporary protection order associated with Stepfather's criminal case was in place. It is important to note that Father filed his petition for the DVCPO in this case less than a month after the temporary protection order of the municipal court ended.

{¶ 58} In *M.H.,* the court based its decision to grant the DVCPO on former R.C. 3113.31(A)(1)(b), which defined domestic violence as "[p]lacing another person by the threat of force in fear of imminent serious physical harm." *Id.* at ¶ 6. This "imminent serious physical harm" portion of the statute has been recodified in R.C. 3113.31(A)(1)(a)(ii), which is not at issue in Stepfather's DVCPO. This DVCPO is based on R.C. 3113.31(A)(1)(a)(iii), which focuses on actually committing child

abuse rather than threatening force to cause the victim to fear "imminent serious physical harm."

{¶ 59} The *M.H.* Court reversed the trial court's granting the DVCPO, finding that "there was insufficient evidence from which the trial court could have found that there was a recent threat of domestic violence upon which M.H. could reasonably premise fear of imminent harm to herself" or her child. *Id.* at ¶ 12. Again, this case involves actual domestic violence rather than the threat of domestic violence.

{¶ 60} In *Solomon*, the court stated that granting a DVCPO "cannot be based solely on previous incidents of alleged domestic violence . . . . Rather, the petitioner must establish by a preponderance of the evidence that an act of domestic violence occurred on the date set forth on the petition for a civil protection order." *Id.* at ¶ 23. The DVCPO in this case is based on the act of domestic violence set forth in the petition, which occurred approximately seven months prior to the date the petition was filed and less than one month after Stepfather pled no contest to assaulting T.H. and the temporary protection order associated with that criminal case dissolved.

{¶ 61} In *K.B.,* the domestic-violence incident upon which the DVCPO was based occurred more than two years before the petition was filed and additional incidents identified during the hearing did not rise to the level of domestic violence as child abuse is defined in R.C. 2151.031 or 3113.31(A)(1). *Id.* at ¶ 16, 17. Accordingly, the *K.B.* Court found insufficient evidence to grant the DVCPO and reversed the trial court's judgment. *Id.* at ¶ 21.

{¶ 62} In this case, evidence was presented at the full hearing that Stepfather committed child abuse against T.H., Stepfather was charged criminally and, less than one month after he was convicted, Father filed his DVCPO petition based on this domestic-violence incident. These facts are in line with granting a DVCPO pursuant to R.C. 3113.31(A)(1)(a)(iii).

{¶ 63} Upon review, we find that Father presented sufficient evidence at the hearing to show that Stepfather committed domestic violence against T.H. by pushing him into a wall twice, which resulted in T.H. suffering a concussion. Further, evidence in the record shows that Mother was dismissive about Stepfather abusing T.H., particularly in failing to respond to Father's inquiries about the incident, marrying Stepfather during the pendency of these proceedings, and not showing to CCDCFS a concern or a "protective capacity" regarding the incident.

{¶ 64} Furthermore, Stepfather failed to meet his burden under Civ.R. 65.1 regarding his objections to the magistrate's decision. Under Civ.R. 65.1(F)(3)(d)(iii), objections to a magistrate's decision concerning a DVCPO may be based on three things: 1) "an error of law or other defect" that is "evident on the face of the order"; 2) the "credible evidence . . . is insufficient to support the granting or denial" of the order; or 3) the magistrate abused his or her discretion "in including or failing to include specific terms" in the order.

{¶ 65} In Stepfather's appellate brief, he does not cite Civ.R. 65.1, and it is unclear on which of the three options his argument is based. From what we can glean from his brief, Stepfather's argument in his third assignment of error is most

likely based on option number two — whether the credible evidence in the record is insufficient to support granting the DVCPO. This argument essentially overlaps Stepfather's argument in his second assignment of error and, for the same reasons previously discussed, is without merit.

{¶ 66} Accordingly, the court did not err by granting the DVCPO against Stepfather in this case and his second and third assignments of error are overruled.

{¶ 67} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Domestic Relations Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

LISA B. FORBES, P.J., and
DEENA R. CALABRESE, J., CONCUR